C.    **Kwame Kilpatrick and Bernard Kilpatrick Solicited
and Took Money, Private Jet Flights and Entertainment
Expenses Worth at least $100,000 from James Rosendall;
Bernard Kilpatrick Attempted to Extort $5,000 from Rosendall**

238.    As set forth more fully in this subsection below, from about 2001 to about 2008, KWAME KILPATRICK and BERNARD KILPATRICK solicited and took money, private jet flights, entertainment expenses and donations to KWAME KILPATRICK's non-profits and political entities worth more than $100,000 from James Rosendall, an executive of *Company S*, in exchange for the support of KWAME KILPATRICK and other members of the Mayor's Office for a $47 million per year sewage sludge disposal contract (the "sludge contract"). In about 2008, BERNARD KILPATRICK attempted to extort $5,000 from Rosendall by threatening to "kill" the sludge contract if he was not paid.

239.    In or about mid-2001, in a house near the State Capital in Lansing, Rosendall told KWAME KILPATRICK that *Company S* wanted to take over the contract the City had entered with another company to handle its wastewater sludge, then gave KWAME KILPATRICK and an aide three bundled campaign checks totaling more than $10,000 for KWAME KILPATRICK's campaign for Mayor.

240.    In about late 2002, KWAME KILPATRICK met Rosendall in a hotel suite in Grand Rapids, Michigan and instructed Rosendall to work with KILPATRICK's aide, Miller, on the sludge contract.

241.    In or about March 2003, *Company S* submitted a proposal to DWSD to revise an existing waste disposal and hauling contract between DWSD and another company with the intent that *Company S* would take over the sludge contract.

-51-

242. In or about early 2003, at a fund raiser at the Manoogian Mansion, KWAME KILPATRICK introduced Rosendall to BERNARD KILPATRICK, telling Rosendall he wanted Rosendall to work with BERNARD KILPATRICK on the sludge contract. Rosendall understood this to mean that KWAME KILPATRICK wanted Rosendall to hire BERNARD KILPATRICK.

243. In or about early 2003, shortly after the fund raiser at the Manoogian Mansion, BERNARD KILPATRICK introduced Rosendall to Rayford Jackson, explaining that Jackson would be Rosendall's point of contact in the sludge deal. Thereafter, BERNARD KILPATRICK spent little time helping to obtain the approval of the DWSD or the Detroit City Council for the sludge contract, although he periodically would ask Rosendall for money, including requests for "loans," totaling at least $25,000, which were never repaid.

244. From about 2003 to 2007, acting on the instructions of KWAME KILPATRICK, City officials including Kandia Milton lobbied the DWSD and the Detroit City Council to support the sludge contract. This included resolving financial, liability, environmental and regulatory issues.

245. In or about 2003 or 2004, MERCADO declined to open the sludge contract to competitive bidding despite a request to do so by DWSD staff involved in the negotiation of the contract.

246. In or about the Fall of 2003, Rosendall chartered a private jet costing more than $19,000 to take KWAME KILPATRICK, Miller and several of their associates to Las Vegas over the weekend of September 12, 2003. Rosendall spent more than $2,000 entertaining the group while in Las Vegas. Neither KILPATRICK, Miller, nor their associates reimbursed Rosendall for the flight or the other expenses.

-52-

247.    In or about the Spring of 2004, Rosendall chartered a private jet costing more than $15,000 to take Miller and several of his associates to Las Vegas over the weekend of April 2, 2004. Rosendall spent more than $4,000 for food, lodging and entertainment for the group while in Las Vegas. Neither Miller nor his associates reimbursed Rosendall for the flight or the other expenses.

248.    On or about October 31, 2005, Rosendall wrote a check for $7,500 to the Kilpatrick Civic Fund.

249.    On or about November 11, 2005, Rosendall wrote a check for $10,000 to Generations PAC, KWAME KILPATRICK's political action committee.

250.    On or about January 3, 2006, Rosendall wrote a check for $5,000 to the Kilpatrick Inaugural Committee.

251.    On or about February 13, 2006, at BERNARD KILPATRICK's request, Rosendall gave BERNARD KILPATRICK $5,000 as a purported loan, which was never repaid.

252.    On or about August 18, 2006, at BERNARD KILPATRICK's request, Rosendall gave BERNARD KILPATRICK a $5,000 check, labeled as a loan, which was never repaid.

253.    In or about 2006, BERNARD KILPATRICK advised Rosendall that BERNARD KILPATRICK had an agreement with Rayford Jackson giving BERNARD KILPATRICK 50% of all proceeds Jackson received from the sludge contract, totaling about $1 million over three years.

254.    In or about 2006, BERNARD KILPATRICK introduced Rosendall to BERNARD KILPATRICK's girlfriend, saying she would be in charge of recruiting and hiring

-53-

minority contractors to help build and operate the sludge processing facility.  BERNARD KILPATRICK instructed Rosendall that his girlfriend, rather than BERNARD KILPATRICK, should be named in any *Company S* contracts involving BERNARD KILPATRICK to conceal BERNARD KILPATRICK's role.

255.    On or about May 19, 2007, Rosendall wrote a check for $3,400 to Kilpatrick for Mayor.

256.    In or about June 2007, Rosendall chartered a private plane to return KWAME KILPATRICK and BERNARD KILPATRICK to Detroit from Mackinac Island.  Rosendall was not reimbursed for the flight.

257.    In or about June 2007, DWSD approved the contract with *Company S*.

258.    On or about September 26, 2007, BERNARD KILPATRICK told Kandia Milton that he would see if he could make it MERCADO's "urgency" to complete the sludge deal.

259.    On or about November 27, 2007, KWAME KILPATRICK signed a resolution approving the sludge contract, valued at about $47 million per year, with a 25-year term.

260.    On or about December 4, 2007, BERNARD KILPATRICK and his girlfriend met Rosendall at a restaurant in Birmingham, at which time BERNARD KILPATRICK explained that he had an unwritten agreement with Rayford Jackson that any profits Jackson derived from the sludge contract would be split as follows: 45% to BERNARD KILPATRICK, 45% to Jackson and 10% to BERNARD KILPATRICK's girlfriend, with the payment to BERNARD KILPATRICK structured through his girlfriend to conceal BERNARD KILPATRICK's interest.

261.    On or about December 20, 2007, in a parking lot in Detroit, BERNARD KILPATRICK attempted to extort Rosendall, threatening him that "we" would "kill" the sludge contract if BERNARD KILPATRICK was not compensated to his satisfaction.  Rosendall gave BERNARD KILPATRICK about $300 in cash, hidden in a pack of chewing gum, in an effort to temporarily pacify him.

262.    On or about March 5, 2008, outside BERNARD KILPATRICK's residence in Detroit, BERNARD KILPATRICK held up five fingers, indicating he wanted Rosendall to give him $5,000.  Later that day, BERNARD KILPATRICK took $2,500 in cash from Rosendall, saying he was "the one guy that made [*the sludge contract*] happen" and confirming that if he had not been paid, he would have told KWAME KILPATRICK, "Do what you can to stop it [*the sludge contract*] for a year.  Stop it for two years."

263.    On or about April 16, 2008, in a restaurant parking lot in Southfield, BERNARD KILPATRICK took $2,500 in cash from Rosendall in connection with the sludge contract.

**D.    Kwame Kilpatrick Solicited and Took Private Jet Flights Worth Over $300,000 From a Representative of *Company I***

264.    As set forth more fully in this subsection, below, from about August 2003 to January 2008, KWAME KILPATRICK requested the use of the private jets of a representative of *Company I* on at least eighteen occasions for the personal use of KWAME KILPATRICK and his friends and family, including BOBBY FERGUSON and BERNARD KILPATRICK, without reimbursing the representative.  The representative provided this free private jet service, worth

over $260,000, in part so KWAME KILPATRICK and the Mayor's Office would not harm the representative's business interests in the City, including *Company I*.

265.    In or about 2006, after KWAME KILPATRICK had used the private jets a number of times, the representative of *Company I* asked KILPATRICK if he thought he should start paying for some of the flights because "it did not look good" for the representative to provide the flights for free.  KILPATRICK said he would see about it but never otherwise responded to the representative of *Company I*.

266.    In or about 2006, one of the representative's employees suggested to a high-level member of the Mayor's administration that they consider setting up a nonprofit entity which could receive donations to pay for KWAME KILPATRICK's flights.  The City official said they were not interested in doing this.

267.    The representative of *Company I* continued to pay for KWAME KILPATRICK's flights in part because he knew KWAME KILPATRICK could adversely impact his businesses in the City if he refused.  The flights, having a fair market value to KWAME KILPATRICK of more than $260,000 and an added variable cost to the representative of more than $120,000, were as follows:

| Par. No. | Date(s) | Destination(s) | Flights | Passen-gers | Added Cost to Owner | Fair Market Value |
|----------|---------|----------------|---------|-------------|---------------------|-------------------|
| 268. | 2/25/04 to 2/28/04 | Washington, D.C. | 2 | 4 | $4,473.59 | $7,750.00 |
| 269. | 4/12/04 to 4/16/04 | Orlando | 2 | 8 | $8,947.19 | $11,760.00 |

| Par. No. | Date(s) | Destination(s) | Flights | Passengers | Added Cost to Owner | Fair Market Value |
|---|---|---|---|---|---|---|
| 270. | 7/24/04 to 7/25/04 | East Hamptons Boston | 2 | 3 | $3,890.08 | $10,466.00 |
| 271. | 10/15/04 to 10/16/04 | Houston | 2 | 6 | $10,114.20 | $14,659.00 |
| 272. | 5/19/05 | Cleveland | 2 | 9 | $1,167.02 | $2,025.00 |
| 273. | 5/27/05 to 5/28/05 | Greensboro, NC | 2 | 1 | $4,279.08 | $6,160.00 |
| 274. | 7/7/06 to 7/8/06 | Houston | 2 | 2 | $9,919.70 | $16,919.00 |
| 275. | 8/2/06 to 8/6/06 | Bermuda | 3 | 9 | $11,281.23 | $20,382.00 |
| 276. | 10/27/06 to 10/28/06 | Tallahassee | 2 | 3 | $7,974.66 | $10,480.00 |
| 277. | 4/12/07 | Naples, FL to Detroit | 1 | 5 | $4,668.10 | $13,765.00 |
| 278. | 5/1/07 | Tallahassee | 2 | 7 | $7,196.65 | $10,360.00 |
| 279. | 5/27/07 to 5/29/07 | Tallahassee | 2 | 7 | $7,391.15 | $20,625.00 |
| 280. | 6/13/07 to 6/14/07 | Tallahassee | 2 | 3 | $7,196.65 | $10,360.00 |
| 281. | 6/30/07 to 8/14/07 | Tallahassee | 2 | 7 | $7,196.65 | $22,240.00 |
| 282. | 9/16/07 to 9/17/07 | Tallahassee | 2 | 3 | $7,391.15 | $20,720.00 |

| Par. No. | Date(s) | Destination(s) | Flights | Passen- gers | Added Cost to Owner | Fair Market Value |
|---|---|---|---|---|---|---|
| 283. | 11/2/07 to 11/5/07 | Tallahassee Miami | 3 | 6 | $10,308.71 | $26,880.00 |
| 284. | 12/27/07 | Tallahassee | 1 | 5 | $3,890.08 | $10,360.00 |
| 285. | 1/23/08 to 1/27/08 | Tallahassee | 2 | 5 | $7,585.66 | $28,582.00 |
| | Totals | | | | $124,871.55 | $264,493.00 |

**E.      Kwame Kilpatrick Obtained More than $75,000 in Free Private Jet Flights and Entertainment From A Representative of *Company M* And Attempted to Extort a $100,000 Donation to the Kilpatrick Civic Fund**

286.    As set forth more fully in this subsection, below, in or between 2006 and 2007, KWAME KILPATRICK and others acting on his behalf obtained free private jet service and entertainment expenses worth more than $74,000 from *Company M*.  In addition, KWAME KILPATRICK and others acting on his behalf attempted to extort from *Company M* a $100,000 payment to the Kilpatrick Civic Fund by exploiting *Company M*'s fear that if it did not do so, KWAME KILPATRICK and his *ex officio* representatives and allies on the City of Detroit Police and Fire ("P&F") pension fund and the City of Detroit General Retirement System ("GRS") would financially harm *Company M*'s business managing over $150 million in properties owned by the P&F and a $10 million GRS investment.

287.    In or about 2006, at the direction of KWAME KILPATRICK, two upper-level officials in the Mayor's Office, including one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, told a representative of *Company M* that KWAME

KILPATRICK was upset with the representative for supporting KWAME KILPATRICK's opponent in the November 2005 election for mayor.

288. In or about April 2007, in an attempt to reconcile with KWAME KILPATRICK, *Company M*, at the request of one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, permitted KWAME KILPATRICK and five of his associates to fly on a private jet *Company M* chartered to Las Vegas over the weekend of April 13, 2007, for a golfing trip. *Company M* paid for greens fees, lodging, meals, limousine service, concert tickets and massages for KWAME KILPATRICK and his group at a cost of more than $16,000, which was never reimbursed.

289. In or about mid-July 2007, *Company M*, at the request of one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, chartered a private plane for KWAME KILPATRICK at a cost of more than $24,000 so KWAME KILPATRICK could go on a trip to Tallahassee, Florida over the weekend of July 20, 2007. No one from *Company M* went on this trip nor was *Company M* reimbursed by KWAME KILPATRICK.

290. In or about mid-September 2007, *Company M*, at the request of one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds, chartered a private plane for KWAME KILPATRICK at a cost of more than $34,000 so KWAME KILPATRICK could fly to Bermuda over the weekend of October 4, 2007 with KWAME KILPATRICK's wife, BERNARD KILPATRICK and BERNARD KILPATRICK's companion. No one from *Company M* went on this trip nor was *Company M* reimbursed by KWAME KILPATRICK.

291. In about 2008, one of KWAME KILPATRICK's *ex officio* representatives to the City pension funds told a representative of *Company M* that *Company M* had to "step up" by making a $100,000 donation to the Kilpatrick Civic Fund. The representative of *Company M* declined, telling KWAME KILPATRICK's representative, "do what you have to do."

**F.     Kwame Kilpatrick Accepted Cash Kickbacks in
Connection with the Lease and Sale of City Properties**

292. In about the Fall of 2003, after learning that his Chief Administrative Officer, Derrick Miller, would financially benefit from a City contract to manage the City's real estate, KWAME KILPATRICK approved a contract with a *Real Estate Company*.

293. Between about October 2003 to 2007, Miller and KWAME KILPATRICK split cash kickbacks from a consultant to the *Real Estate Company*, totaling about $115,000, which were funded from commissions the consultant received for property transactions for the City.

**G.     Kwame Kilpatrick Directed Miller to Obtain Money from a
Restaurant Developer Who was Seeking a Loan From City Pension Funds**

294. In about the fall of 2007, KWAME KILPATRICK asked Miller to try to obtain money from a *Restaurant Developer* who was seeking a loan from the City's pension funds for the Asian Village restaurant development.

295. In about the fall of 2007, Miller obtained $10,000 cash from the *Restaurant Developer*, which Miller gave to KWAME KILPATRICK in a restroom in the developer's Detroit restaurant.

**H.     Kwame Kilpatrick Directed Marc Andre Cunningham to Pay Bernard Kilpatrick Part of Cunningham's Commission for Pension Fund Investments**

296.    As set forth more fully in this subsection, below, in or between about 2006 and 2007, at the direction of KWAME KILPATRICK, the Mayor's executive assistant, Marc Andre Cunningham, paid BERNARD KILPATRICK at least $15,000 of Cunningham's commission on a pension fund consulting deal, in return for KWAME KILPATRICK's support of investments by the City of Detroit's General Retirement System ("GRS") and Police and Fire ("P&F") pension funds to a firm Cunningham represented.

297.    In or about the Summer of 2006, at a restaurant in Detroit, KWAME KILPATRICK, through one of his high-level aides, directed Cunningham to pay BERNARD KILPATRICK a portion of the commissions Cunningham received from a venture capital firm ("the Firm") for Cunningham's assistance obtaining a $30 million investment from the GRS and the P&F pension funds.  KWAME KILPATRICK was present when Cunningham was told to make these payments.

298.    On or about October 4, 2006, at the direction of KWAME KILPATRICK, Cunningham met with BERNARD KILPATRICK at the Coleman A. Young Municipal Center and provided BERNARD KILPATRICK at least $4,000 in cash.  It was understood between Cunningham and KWAME KILPATRICK that this and future payments were to be made to BERNARD KILPATRICK to reward KWAME KILPATRICK for his support of the GRS and P&F investments and to obtain favorable treatment by KWAME KILPATRICK in any future business that might arise between Cunningham and the City of Detroit.

299.    On or about January 29, 2007, at the direction of KWAME KILPATRICK, Cunningham met with BERNARD KILPATRICK at the Coleman A. Young Municipal Center and provided BERNARD KILPATRICK at least $4,000 in cash.

300.    On or about June 27, 2007, at the direction of KWAME KILPATRICK, Cunningham met with BERNARD KILPATRICK at the Coleman A. Young Municipal Center and provided BERNARD KILPATRICK at least $4,000 in cash.

301.    Between about October 2006 and June 2007, KWAME KILPATRICK asked Cunningham when he was going to be paid his commission, as a way to remind Cunningham to pay BERNARD KILPATRICK when he received the commission payment.

302.    In or about the Fall of 2007, following a media report of an FBI undercover corruption investigation that implicated Cunningham, KWAME KILPATRICK told Cunningham to stop paying BERNARD KILPATRICK.

**I.    Ferguson Directed Owner of *Company E* to Pay Bernard Kilpatrick $40,000**

303.    In or about January 2005, FERGUSON directed the owner of *Company E* to pay BERNARD KILPATRICK $40,000 so *Company E* could obtain business with the City.

304.    On or about January 21, 2005, the owner of *Company E* paid BERNARD KILPATRICK $40,000.

305.    Following the payment, BERNARD KILPATRICK did not help *Company E* obtain any City business.

**J.    Ferguson and Kwame Kilpatrick Obtained
More than $90,000 from a *Towing Contractor***

306.    As Mayor of Detroit, KWAME KILPATRICK had responsibility over the

Detroit Police Department and its towing contracts, including towing contracts belonging to the

*Towing Contractor*.

307.    In or about February 2003, at the direction of members of the Kilpatrick

Enterprise, an associate of KWAME KILPATRICK obtained about $9,000 cash from the

*Towing Contractor*.

308.    In or about July 2004, the *Towing Contractor* gave $25,000 to a Political

Action Committee ("PAC"), with instructions that the PAC give the money to KWAME

KILPATRICK's campaign; the PAC gave the *Towing Contractor's* $25,000 to KILPATRICK's

campaign that same month.

309.    In or about 2005, FERGUSON directed the *Towing Contractor* to give $9,500

cash to FERGUSON; the *Towing Contractor* complied in order to prevent FERGUSON from

using his influence with KWAME KILPATRICK to adversely affect the *Towing Contractor's*

business with the Detroit Police Department.

310.    On or about May 25, 2005, KWAME KILPATRICK directed a high level

member of the Detroit Police Department to meet with the *Towing Contractor* to review the

*Towing Contractor's* proposal to manage all the towing for the Police Department.

311.    In or about October 2005, KWAME KILPATRICK, through his subordinates,

directed high level members of the Detroit Police Department to add several of the *Towing*

*Contractor's* companies to Police Department tow lists, resulting in increased business for the *Towing Contractor*.

312. In about May 2008, FERGUSON directed the *Towing Contractor* to give him $100,000; the *Towing Contractor*, fearing that FERGUSON might use his influence with KWAME KILPATRICK to adversely affect the *Towing Contractor's* business with the Detroit Police Department, gave FERGUSON $50,000 in about June 2008, which FERGUSON shared with KWAME KILPATRICK.

## IV. WITNESS TAMPERING, WITNESS INTIMIDATION, PERJURY, AND OBSTRUCTION OF JUSTICE

313. As set forth more fully in this subsection, between about 2001 and 2006, BOBBY FERGUSON, VICTOR MERCADO and other members of the Kilpatrick Enterprise promoted and preserved the Kilpatrick Enterprise and its objectives by tampering with and intimidating witnesses, committing perjury and obstructing justice in both state and federal proceedings.

### A. Ferguson, Assisted by Members of Kwame Kilpatrick's Executive Projection Unit, Intimidated a Detroit Police Officer into Dropping Illegal Dumping Charges Against Ferguson Enterprises

314. In about September and October of 2001, *Officer A*, a 10th Precinct Detroit Police Officer assigned to enforce environmental compliance by commercial businesses, issued citations to BOBBY FERGUSON for environmental ordinance violations, including illegally dumping waste on property owned by the City of Detroit.

315. On or about November 26, 2001, *Officer A* attended BOBBY FERGUSON's arraignment on the ordinance violations at 36th District Court. FERGUSON asked *Officer A* if he

-64-

knew who FERGUSON was, then questioned whether *Officer A* still wanted to proceed with the prosecution of the ordinance violations. *Officer A* indicated that he intended to proceed and the case was set for trial.

316.    On about February 5, 2002, following KWAME KILPATRICK's inauguration as Mayor, FERGUSON appeared in 36th District Court for trial on the ordinance violations accompanied by two Detroit Police Officers assigned to KWAME KILPATRICK's Executive Protection Unit ("EPU"). FERGUSON and one of the EPU officers approached *Officer A* in the hallway outside the courtroom and the EPU Officer told *Officer A* that it would be in the best interest of *Officer A* and everyone concerned if *Officer A* dropped the prosecution of the ordinance violations. Shortly thereafter, *Officer A*, fearing for the safety of his family, caused the ordinance violations against Ferguson Enterprises to be dismissed.

**B.    Ferguson Attempted to Cause "Straw Donors" to
Lie to Federal Investigators and a Federal Grand Jury**

317.    From about June to July 2005, FERGUSON and his associates instructed some of the "straw donors" identified in paragraph 314, below, whom FERGUSON had used to give $40,000 to the Kilpatrick for Mayor campaign ("Kilpatrick for Mayor") in violation of state law, to lie to federal investigators and a federal grand jury about the fact that FERGUSON had funded their donations to Kilpatrick for Mayor, including the following:

a.    In about June 2005, FERGUSON told *Straw Donor A* to tell FBI agents that she had paid for the money orders she signed for Kilpatrick for Mayor, when in truth and fact, as they both well knew, FERGUSON had funded the donations. After *Straw Donor A* reported back to FERGUSON that she had told the FBI agents that she paid for

-65-

the money orders, FERGUSON told her to stick to that story because otherwise they both could go to jail. FERGUSON further instructed *Straw Donor A* to tell one of her family members, who also made a straw donation to Kilpatrick for Mayor, to claim that the family member had paid for her donation, when in truth and fact, as they both well knew, FERGUSON had funded it.

b.      In about July 2005, shortly before *Straw Donor B* was to testify before a federal grand jury, FERGUSON showed up unannounced at her house and instructed her to deny to the grand jury that the money orders she signed for Kilpatrick for Mayor came from FERGUSON, when in truth and fact, as they both well knew, FERGUSON paid for the money orders. FERGUSON warned *Straw Donor B* that if she told the grand jury that FERGUSON had paid for the money orders, she would get one of her family members in trouble.

c.      In about June 2005, an associate of FERGUSON told *Straw Donor C* to tell investigators that he paid for his money order to Kilpatrick for Mayor, when in truth and fact as they both well knew, FERGUSON paid for the donation.

**C.      Victor Mercado Committed Perjury in an Investigation of the Awarding of a DWSD Security Contract Authorized by a Federal Judge**

318.      On about February 10, 2006, MERCADO testified at a deposition authorized by a federal judge investigating the appropriateness of the award of a DWSD security contract to FERGUSON's team, given FERGUSON's purported relationship to Mayor KWAME KILPATRICK and the fact that FERGUSON's team's bid was higher. MERCADO falsely testified that the security contract was completed on time and on budget without extras or

change orders.  When asked whether he had any conversations with FERGUSON, MERCADO testified, "Absolutely not.  I don't talk to bidders when they're bidding."  MERCADO further denied having any contact with members of the Mayor's Office during the negotiations over the security contract.  As MERCADO well knew at that time, however, the security contract would require more time and money before it was completed.  In order to obscure any additional security system costs, MERCADO, in the weeks leading up to his deposition, authorized that additional security system work at DWSD facilities be funded out of an unrelated pump station contract, rather than the security contract.  Moreover, contrary to his deposition testimony, MERCADO had a number of meetings and conversations with FERGUSON and Miller at critical stages during DWSD's evaluation of the security contract, including with Miller on January 13, 2004 and with FERGUSON on February 11, 2004.

## V.   PROCEEDS FROM THE RACKETEERING ACTIVITY

### A.   Ferguson Shared Proceeds of the Racketeering Activity With Kwame Kilpatrick

319.   In or about early July 2003, FERGUSON gave KWAME KILPATRICK about $7,000 in cash.  In or about late July 2003, FERGUSON collected more than $200,000 in campaign donations for KWAME KILPATRICK's campaign fund, with KWAME KILPATRICK's knowledge, although FERGUSON was not among the identified donors.

320.   In or about late May 2004, FERGUSON gave KWAME KILPATRICK at least $12,500 in cash on consecutive dates, consisting of at least $8,500 cash on one day and at least $4,000 cash the next day.

321.    In or about mid July 2004, in violation of State campaign finance laws, FERGUSON caused the purchase of more than $40,000 in money orders using funds from Ferguson Enterprises, which were then given to employees, friends, relatives and associates of FERGUSON to sign and endorse to Kilpatrick for Mayor in order to conceal that FERGUSON and his company were the true source of the donations.

322.    In or about late March 2008, FERGUSON gave $75,000 to the Kilpatrick Civic Fund.

323.    In or about the Summer of 2008, FERGUSON went to *Courier A*'s room at the Athenium Hotel in Detroit and gave him a bag containing $90,000 in cash with instructions to hold the money for KWAME KILPATRICK.  At KWAME KILPATRICK's direction, *Courier A* delivered the cash to KWAME KILPATRICK in two installments, giving him $50,000 cash at the Hilton Hotel in Southlake, Texas in or about mid-September 2008, and $40,000 cash at the Park Shelton Apartments in Detroit in or about late October 2008.

**B.      Kwame Kilpatrick Used Cash Proceeds from the Racketeering Activity**

324.    In or about the following years, KWAME KILPATRICK used the following amounts of cash, derived from the racketeering activity, to make deposits into his bank accounts, pay his credit card and other bills, purchase cashier's checks and clothing and repay loans:

| Par. No. | Year | Type of Cash Transactions | Total Cash Amount |
|---|---|---|---|
| 325. | 2002 | cash bank deposits and cash payments for credit card and clothing | $29,314.00 |
| 326. | 2003 | cash bank deposits and cash payments for credit card and clothing | $80,070.00 |

| Par. No. | Year | Type of Cash Transactions | Total Cash Amount |
|---|---|---|---|
| 327. | 2004 | cash bank deposits and cash payments for credit card and clothing | $68,548.00 |
| 328. | 2005 | cash bank deposits, cash payments for credit card and clothing, cash purchases of cashier's checks | $80,200.00 |
| 329. | 2006 | cash bank deposits and cash payments for credit card and clothing | $92,474.00 |
| 330. | 2007 | cash bank deposits, cash payments for credit card and clothing, cash purchase of cashier's check | $105,961.00 |
| 331. | 2008 | cash bank deposits, cash payments for credit card, clothing and crisis manager, cash purchases of cashier's checks, cash loan repayments | $124,379.00 |
| 332. | 2009 | cash payments on credit card and cash loan repayments | $13,913.00 |
|  | Total |  | $594,859.00 |

## C.   Bernard Kilpatrick Used Cash Proceeds From the Racketeering Activity

333.   In or about the following years, BERNARD KILPATRICK deposited the following amounts of cash from the racketeering activity into his personal bank accounts:

| Par. No. | Year | Type of Cash Transactions | Yearly Total Amount of Cash Deposits |
|---|---|---|---|
| 334. | 2002 | cash bank deposits | $122,810.00 |
| 335. | 2003 | cash bank deposits | $134,240.00 |
| 336. | 2004 | cash bank deposits | $123,700.00 |

-69-

| Par. No. | Year | Type of Cash Transactions | Yearly Total Amount of Cash Deposits |
|---|---|---|---|
| 337. | 2005 | cash bank deposits | $88,300.00 |
| 338. | 2006 | cash bank deposits | $59,905.00 |
| 339. | 2007 | cash bank deposits | $50,200.00 |
| 340. | 2008 | cash bank deposits | $23,900.00 |
| | Total | | $603,055.00 |

**All in violation of Title 18, United States Code, Section 1962(d).**

## COUNT TWO
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Sewer Lining Contract)

**D-1 KWAME M. KILPATRICK**
**D-2 BOBBY W. FERGUSON**
**D-3 BERNARD N. KILPATRICK**

1. The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2. From in or about April 2002 to November 2006, in the Eastern District of Michigan, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, and BERNARD N. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained payments from *Company I* consisting of contract revenues of more than $23.7 million, with the consent of *Company I* induced by wrongful fear of economic harm and under color of official right. That is, KWAME KILPATRICK, aided and abetted by FERGUSON and BERNARD KILPATRICK, held up a $50 million sewer lining contract that previously had been awarded to *Company I* until the company

-70-

agreed to replace its minority subcontractor with FERGUSON on terms acceptable to FERGUSON.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

## COUNT THREE
(18 U.S.C. § 1951 – Interference with Commerce by Extortion
Amendment to Sewer Lining Contract)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in and between September 2004 and December 23, 2005, in the Eastern District of Michigan, defendants KWAME M. KILPATRICK and BOBBY W. FERGUSON, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained payments from *Company I* of about $175,000 in connection with an amendment to a sewer lining contract, with the consent of *Company I* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

## COUNT FOUR
(18 U.S.C. § 1951  – Interference with Commerce by Extortion – Baby Creek/Patton Park)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**
**D-4    VICTOR M. MERCADO**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

-71-

2.    From in and between February 2003 and 2008, in the Eastern District of Michigan, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, and VICTOR M. MERCADO, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained from *Company W* more than $5 million in work for FERGUSON and his affiliated companies at Baby Creek and Patton Park, with the consent of *Company W* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

**COUNT FIVE**
(18 U.S.C. § 1951 – Attempted Interference with Commerce by Extortion
Oakwood Pump Station)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**
**D-4    VICTOR M. MERCADO**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about January 2007 to about April 2007, in the Eastern District of Michigan, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON and VICTOR M. MERCADO, aiding and abetting each other, did knowingly and unlawfully attempt to obstruct, delay and affect interstate commerce through extortion, in that defendants KWAME KILPATRICK, FERGUSON and MERCADO pressured *Company W* to consent to partner with FERGUSON in a $140 million construction project at the Oakwood pump station, and attempted to induce that consent by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

-72-

## COUNT SIX
(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds
Downtown Water Main Repairs)

**D-1   KWAME M. KILPATRICK**
**D-2   BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    In or between about 2003 and 2007, in the Eastern District of Michigan, defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that received more than $10,000 in federal funding during each of the calendar years of 2003 through 2007, did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept a stream of gratuities totaling more than $5,000 from defendant BOBBY W. FERGUSON, intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit.  That is, in exchange for items of value from FERGUSON, KWAME KILPATRICK, with the assistance of other City officials, steered subcontracts and emergency task orders to FERGUSON in connection with a $19.8 million downtown water main replacement contract administered by *Company D*. Following their intervention into the contracting process, including giving FERGUSON downtown work originally assigned to the lowest bidder, FERGUSON, from the start of the contract through the Spring of 2007, obtained more than $4 million in work on the downtown water main project.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

## COUNT SEVEN
(18 U.S.C. § 1951  – Interference with Commerce by Extortion – Outfalls Contract)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about the Summer of 2005 to about the Summer of 2007, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained payments from *Company L* and *Company A* of more than $1.7 million from a sewer outfalls contract for no services rendered, with the consent of *Company L* and *Company A* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**


## COUNT EIGHT
(18 U.S.C. § 1951  – Interference with Commerce by Extortion – Asbestos Abatement)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about October 2005 to about February 2007 in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce

-74-

through extortion, in that they obtained payments from *Company L* of about $75,000 in relation to an asbestos contract for no services rendered, with the consent of *Company L* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

## COUNT NINE
(18 U.S.C. § 1951 – Interference with Commerce by Extortion
Repair of Eastside Water Mains)

**D-1   KWAME M. KILPATRICK**
**D-2   BOBBY W. FERGUSON**

1.   The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.   From in or about the Spring of 2006 to about August 2008, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that FERGUSON and his affiliated company, Xcel Construction Services, obtained payments and subcontracts from *Company L* and *Company A* worth more than $12.9 million from a contract to repair water mains on the east side of the City, with the consent of *Company L* and *Company A* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

**COUNT TEN**
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Eastside Sewer Repairs)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about the Summer of 2006 to about 2008, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that they obtained more than $5 million in earthwork and point repair work from *Company L* and *Company A* arising out of a sewer repair contract for the east side of the City, with the consent of *Company L* and *Company A* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

**COUNT ELEVEN**
(18 U.S.C. § 1951 – Interference with Commerce by Extortion – Westside Sewer Repairs)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From in or about June 2006 to about 2008, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through

-76-

extortion, in that FERGUSON obtained more than $5 million in sewer repair work on the westside of the City from *Company I*, with the consent of *Company I* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

**COUNT TWELVE**
(18 U.S.C. § 1951  – Interference with Commerce by Extortion – Towing Contractor)

**D-1   KWAME M. KILPATRICK**
**D-2   BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    From about February 2003 until about June 2008, in the Eastern District of Michigan, defendants BOBBY W. FERGUSON and KWAME M. KILPATRICK, aiding and abetting each other, did knowingly and unlawfully obstruct, delay and affect interstate commerce through extortion, in that FERGUSON and KILPATRICK obtained more than $90,000 from a *Towing Contractor*, with the consent of the *Towing Contractor* induced by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951 and 2.**

**COUNT THIRTEEN**
(18 U.S.C. § 666(a)  – Bribery Concerning Programs Receiving Federal Funds
Security Systems Contract)

**D-1   KWAME M. KILPATRICK**
**D-2   BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

-77-

2.     In or between about 2003 and 2008, in the Eastern District of Michigan, defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that received more than $10,000 in federal funding during each of the calendar years of 2003 to 2008, did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept a stream of gratuities totaling more than $5,000 from defendant BOBBY W. FERGUSON, intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit. That is, in exchange for items of value from FERGUSON, KWAME KILPATRICK, with the assistance of other City officials, rigged the evaluation and award of a contract to upgrade security systems at various DWSD facilities ("security contract") so FERGUSON's team would win the contract. From the start of the work to about June 2008, FERGUSON obtained more than $1.2 million of work on the security contract.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

### COUNT FOURTEEN
(18 U.S.C. § 1512(c) – Obstruction of Justice – Mercado Deposition)

**D-4     VICTOR M. MERCADO**

1.     The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.     In or about January and February 2006, in the Eastern District of Michigan, defendant VICTOR M. MERCADO did corruptly obstruct, influence and impede an official proceeding, that is an investigation authorized by a federal judge into the appropriateness of the award of a security contract by the Detroit Water and Sewerage Department. In particular, on or

-78-

about February 10, 2006, during a deposition authorized by a federal judge investigating the appropriateness of a security contract awarded to a team including defendant BOBBY W. FERGUSON, MERCADO testified that the contract was completed on time and on budget without extras or change orders. When asked whether he had any conversations with FERGUSON, MERCADO testified, "Absolutely not. I don't talk to bidders when they're bidding." MERCADO further denied having any contact with members of the Mayor's Office regarding the negotiations over the security contract. In truth and in fact, as MERCADO well knew at that time, the contract would require more time and money before it was completed. In order to obscure any additional security system costs, MERCADO, in the weeks leading up to his deposition, authorized that additional security system work at DWSD facilities be funded out of an unrelated pump station contract, rather than the security contract. Moreover, MERCADO, as he well knew and contrary to his deposition testimony, had a number of meetings and conversations with FERGUSON and Miller at critical stages during DWSD's evaluation of the security contract, including with Miller on January 13, 2004 and with FERGUSON on February 11, 2004.

**All in violation of Title 18, United States Code, Sections 1512(c).**

## COUNT FIFTEEN
(18 U.S.C. § 1951 – Attempted Interference with Commerce by Extortion – Sludge Contract)

**D-3    BERNARD N. KILPATRICK**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.　From in or about December 20, 2007 to about April 18, 2008, in the Eastern District of Michigan, defendant BERNARD N. KILPATRICK did knowingly and unlawfully attempt to obstruct, delay and affect interstate commerce through extortion, namely, demanding payments from James Rosendall, including a payment of about $5,000 for no services rendered, and attempted to induce the consent of Rosendall by wrongful fear of economic harm and under color of official right.

**All in violation of Title 18, United States Code, Sections 1951.**

## COUNT SIXTEEN
(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds – $90,000 Bribe)

**D-1　KWAME M. KILPATRICK**
**D-2　BOBBY W. FERGUSON**

1.　The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.　On or between about mid September 2008 and late October 2008, in the Eastern District of Michigan, defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that received more than $10,000 in federal funding during the calendar year 2008, did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept about $90,000 in cash from defendant BOBBY W. FERGUSON, which was delivered in installments on or about mid September 2008, in Southlake, Texas, and on or about late October 2008, in Detroit, Michigan, intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit, that is, KWAME

KILPATRICK's assistance in steering City contracts to FERGUSON and pressuring persons with City contracts to hire or pay FERGUSON.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

## COUNT SEVENTEEN
(18 U.S.C. § 666(a) – Bribery Concerning Programs Receiving Federal Funds – $75,000 Bribe)

**D-1    KWAME M. KILPATRICK**
**D-2    BOBBY W. FERGUSON**

1.    The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Count One above, as if they were set forth in full herein.

2.    On or about mid March 2008, in the Eastern District of Michigan, defendant KWAME M. KILPATRICK, while an agent of the City of Detroit, an entity that received more than $10,000 in federal funding during the calendar year 2008, did corruptly solicit and demand for the benefit of any person, and accepted and agreed to accept $75,000 from defendant BOBBY W. FERGUSON's company, Ferguson Enterprises, Inc., which was deposited into the Kilpatrick Civic Fund, intending to be influenced and rewarded in connection with business and transactions of a value of $5,000 or more with the City of Detroit, that is, KWAME KILPATRICK's assistance in steering City contracts to FERGUSON and pressuring persons with City contracts to hire or pay FERGUSON.

**All in violation of Title 18, United States Code, Sections 666(a) and 2.**

-81-

## COUNTS EIGHTEEN THROUGH THIRTY
(18 U.S.C. §§ 1341, 1343: Mail and Wire Fraud)

### D-1 KWAME M. KILPATRICK

### General Allegations As to Counts Eighteen Through Thirty

1.    On or about July 8, 1999, the Kilpatrick Civic Fund, Inc. ("the Civic Fund"), controlled by KWAME KILPATRICK, received federal tax exempt status as a social welfare organization pursuant to Section 501(c)(4) of the Internal Revenue Code after KWAME KILPATRICK caused an application to be submitted to the United States Department of the Treasury ("the Treasury Department") ("the application"), which contained the following representations:

   a.    The application claimed that the Civic Fund's purposes were the following:

      i.    Promoting community activities that enhance the neighborhoods in which the citizens of Detroit reside as well as those activities that contribute to the betterment of the lives of the youth of Detroit and its surrounding communities;

      ii.    Providing information to the citizens of the City of Detroit and the State of Michigan about legislative issues affecting their lives and promoting the importance of voting and related activities; and

      iii.    Participating in those activities that contribute to the redevelopment of a positive image of the City of Detroit and benefit the community at large.

   b.    The application further claimed that the Civic Fund had not spent and did

not plan to spend any money attempting to influence the selection, nomination, election or appointment of any person to any federal, state, or local public office.

      c.     The application further claimed that, "[*the Civic Fund*] shall not participate or intervene in ... any political campaign on behalf of or against any candidate for public office."

      d.     The application further claimed that the Civic Fund would operate exclusively for charitable and educational purposes and that it would receive and administer its assets exclusively for charitable, educational, religious or scientific purposes.

      e.     The application further claimed that, "in the event of the dissolution [*of the Civic Fund*], all of [*the Civic Fund's*] assets ... shall be distributed to a 501(c)(4) organization with a similar purpose by majority vote of the Board of Director[*s*]."

### The Scheme and Artifice to Defraud

2.    Beginning In or about 1999, KWAME KILPATRICK devised a scheme and artifice to defraud donors to the Civic Fund of monies they donated to it.

3.    It was part of the scheme and artifice to defraud that KWAME KILPATRICK would claim to the Internal Revenue Service, the public and potential donors that the Civic Fund was a social welfare organization that spent its funds in ways consistent with the purposes stated in its application for tax exempt status.  In truth and in fact, as he well knew, KWAME KILPATRICK used monies donated to the Civic Fund for personal expenses and for his political campaigns, neither of which was identified as one of the purposes of the Civic Fund.

-83-

4. It was part of the scheme and artifice to defraud that KWAME KILPATRICK would hold events to raise money for the Civic Fund, at which he and others would claim to potential donors that the Civic Fund spent its funds in ways consistent with the purposes stated in its application for tax exempt status.

5. It was part of the scheme and artifice to defraud that KWAME KILPATRICK would falsely claim to the news media that the Civic Fund was not used for his political campaigns.

6. It was part of the scheme and artifice to defraud that KWAME KILPATRICK would send and cause to be sent letters to donors and potential donors which claimed that the Civic Fund used its funds consistent with the purposes outlined in its application for tax exempt status and specifically stated that "No funds of the Civic Fund are donated to a political campaign."

7. It was part of the scheme and artifice to defraud that KWAME KILPATRICK caused Civic Fund Returns of Organization Exempt from Income Tax, Forms 990, to be submitted to the Department of the Treasury, Internal Revenue Service, for tax years 2003 through 2008, which misrepresented how the Civic Fund spent its funds.

8. Contrary to the representations KWAME KILPATRICK made and caused to be made to the IRS, the public and donors to the Civic Fund, KWAME KILPATRICK used monies donated to the Civic Fund for the following personal expenses, among others:

    a. Cash kickbacks to KWAME KILPATRICK from an individual who worked for the Civic Fund, consisting of nearly half of the money the Civic Fund paid to that individual;

b.    Money to friends and relatives, including BERNARD KILPATRICK, disguised as payments for purported services rendered to the Civic Fund;

c.    Counter-surveillance and anti-bugging equipment;

d.    Yoga lessons for KWAME KILPATRICK;

e.    Golf-related expenses for KWAME KILPATRICK and others, including lessons, a set of Nike golf clubs and a personalized golf bag;

f.    Summer camp for KWAME KILPATRICK's children;

g.    College tuition for relatives of KWAME KILPATRICK;

h.    A birthday party for a relative of KWAME KILPATRICK;

i.    A video documenting KWAME KILPATRICK's family history;

j.    A crisis manager to manage KWAME KILPATRICK's public image following the public disclosure of text messages sent to and received by KWAME KILPATRICK on a city-owned paging device;

k.    Personal moving costs for KWAME KILPATRICK and his family after he left office;

l.    Lease of a personal residence for KWAME KILPATRICK and his family after they departed from the mayoral residence;

m.    Personal travel, including hotel costs and airfare for KWAME KILPATRICK and his relatives and friends;

n.    Lease of a Cadillac DeVille for KWAME KILPATRICK; and

o.    Rental cars.

-85-

9. KWAME KILPATRICK used monies donated to the Civic Fund for his campaigns for election and reelection to the office of Mayor of the City of Detroit, including, among other things, polling, focus groups, public relations and political consulting.

10. It was also part of the scheme and artifice to defraud that KWAME KILPATRICK, when he resigned as Mayor of Detroit in September 2008, attempted to purchase furniture from the Manoogian Mansion Restoration Society with money from the Civic Fund.

**Execution of the Scheme and Artifice to Defraud**

11. On or about each of the dates set forth below, in the Eastern District of Michigan, Southern Division, defendant KWAME KILPATRICK did, for the purposes of executing the scheme and artifice to defraud described above, and attempting to do so, knowingly caused the items described below to be delivered by U.S. mail or commercial interstate carrier (Federal Express), such items being delivered according to the directions thereon, each such mailing constituting a separate count of this Fourth Superseding Indictment:

| Count | Date and Item Sent via U.S. Mail or Federal Express |
|-------|------------------------------------------------------|
| 18 | June 22, 2006, donor check for $10,000 payable to the Civic Fund sent via Federal Express. |
| 19 | February 13, 2007, letter explaining the Civic Fund to donor sent via U.S. mail. |
| 20 | September 26, 2007, donor check for $5,000 payable to the Civic Fund sent via U.S. mail. |
| 21 | April 3, 2008, Civic Fund check in the amount of $4,500 for summer camp sent via Federal Express. |
| 22 | May 23, 2008, letter soliciting a donation and explaining the Civic Fund to donor sent via U.S. mail |
| 23 | June 4, 2008, Civic Fund check in the amount of $2,640 for summer camp sent via Federal Express. |

-86-

| Count | Date and Item Sent via U.S. Mail or Federal Express |
|---|---|
| 24 | June 4, 2008, donor check for $10,000 payable to the Civic Fund sent via Federal Express. |
| 25 | June 25, 2008, donor check for $1,000 payable to the Civic Fund sent via U.S. mail. |
| 26 | June 30, 2008, donor check for $4,000 payable to the Civic Fund sent via Federal Express. |
| 27 | July 23, 2008, letter explaining the Civic Fund to donor sent via U.S. mail. |

**All in violation of Title 18, United States Code, Section 1341.**

12.    On or about each of the dates set forth below, in the Eastern District of Michigan, Southern Division, KWAME KILPATRICK did, for the purposes of executing the scheme and artifice to defraud described above, and attempting to do so, knowingly caused to be transmitted by means of wire communication (fax) in interstate and foreign commerce certain documents, as listed below, each wire communication constituting a separate count of this indictment:

| Count | Date and Description of Wire Communication |
|---|---|
| 28 | August 24, 2007, letter soliciting a donation and explaining the Civic Fund sent to donor via fax. |
| 29 | April 3, 2008, letter explaining the Civic Fund sent to donor via fax. |
| 30 | June 20, 2008, letter soliciting a donation and explaining the Civic Fund sent to donor via fax. |

**All in violation of Title 18, United States Code, Section 1343.**

**COUNT THIRTY-ONE**
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1    KWAME M. KILPATRICK**

1.     On or about April 11, 2004, in the Eastern District of Michigan, KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2003, which was verified by a written declaration that it was made under the penalties of perjury, and which KWAME KILPATRICK did not believe to be true and correct as to every material matter.  Specifically, KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash, private jet flights and personal expenses paid for by the Civic Fund, amounting to at least $67,181, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $188,227, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

**COUNT THIRTY-TWO**
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1    KWAME M. KILPATRICK**

1.     On or about April 15, 2005, in the Eastern District of Michigan, defendant KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2004, which was verified by a written declaration that it was made under the penalties of perjury, and which KWAME KILPATRICK did not believe to be true and correct as to every material matter.  Specifically,

-88-

KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash and private jet flights, amounting to at least $74,925, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $167,940, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

## COUNT THIRTY-THREE
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1   KWAME M. KILPATRICK**

1.    On or about April 17, 2006, in the Eastern District of Michigan, defendant KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2005, which was verified by a written declaration that it was made under the penalties of perjury, and which KILPATRICK did not believe to be true and correct as to every material matter.  Specifically, KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash and private jet flights, amounting to at least $11,279, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $156,329, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

## COUNT THIRTY-FOUR
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1    KWAME M. KILPATRICK**

1.    On or about April 16, 2007, in the Eastern District of Michigan, defendant KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2006, which was verified by a written declaration that it was made under the penalties of perjury and which KWAME KILPATRICK did not believe to be true and correct as to every material matter.  Specifically, KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash, private jet flights and personal expenses paid for by the Civic Fund, amounting to at least $122,997, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $153,024, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

## COUNT THIRTY-FIVE
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-1    KWAME M. KILPATRICK**

1.    On or about April 15, 2008, in the Eastern District of Michigan, defendant KWAME KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2007, which was verified by a written declaration that it was made under the penalties of perjury and which KWAME KILPATRICK did not believe to be true and correct as to every material matter.  Specifically,

KWAME KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income in the form of cash, private jet flights and personal expenses paid for by the Civic Fund, amounting to at least $194,569, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $167,005, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

### COUNT THIRTY-SIX
(26 U.S.C. § 7201 – Income Tax Evasion)

**D-1  KWAME M. KILPATRICK**

1.    During the calendar year 2008, defendant KWAME KILPATRICK had and received unreported taxable income in the form of cash, private jet flights and personal expenses paid for by the Civic Fund, amounting to at least $261,751.

2.    KWAME KILPATRICK owed the United States of America an income tax of $85,397 for this unreported taxable income.

3.    Well-knowing and believing the foregoing facts, KWAME KILPATRICK, in and between January 1, 2008 and April 13, 2009, in the Eastern District of Michigan, Southern Division, and elsewhere, did willfully attempt to evade and defeat a large part of the income tax due and owing by him and his spouse to the United States of America for the calendar year 2008 and did take affirmative action to evade these taxes.  Specifically, he concealed income from the Internal Revenue Service in the following ways: (a) he caused to be filed a false joint U.S. Individual Income Tax Return, Form 1040, for calendar year 2008; (b) he caused an individual employed by his mayoral campaign and associated non-profits to kick cash back to him from

wages paid to the individual by the campaign and non-profits; and (c) he caused the Civic Fund to pay for certain of his personal expenses and concealed such payments; and (d) he accepted a $90,000 cash payment from FERGUSON.

**All in violation of Title 26, United States Code, Section 7201.**

## COUNT THIRTY-SEVEN
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-3    BERNARD N. KILPATRICK**

1.    On or about October 5, 2005, in the Eastern District of Michigan, defendant BERNARD N. KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for calendar year 2004, which was verified by a written declaration that it was made under the penalties of perjury, and which BERNARD N. KILPATRICK did not believe to be true and correct as to every material matter. Specifically, BERNARD N. KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income amounting to at least $35,632, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $336,625, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

## COUNT THIRTY-EIGHT
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-3    BERNARD N. KILPATRICK**

1.    On or about October 10, 2006, in the Eastern District of Michigan, defendant BERNARD N. KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe

-92-

a U.S. Individual Income Tax Return, Form 1040, for calendar year 2005, which was verified by a written declaration that it was made under the penalties of perjury, and which BERNARD N. KILPATRICK did not believe to be true and correct as to every material matter. Specifically, BERNARD N. KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income amounting to at least $150,329, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $220,259, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

## COUNT THIRTY-NINE
(26 U.S.C. § 7206(1) – Subscribing False Tax Return)

**D-3    BERNARD N. KILPATRICK**

1.    On or about October 15, 2008, in the Eastern District of Michigan, defendant BERNARD N. KILPATRICK, a resident of Detroit, Michigan, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for calendar year 2007, which was verified by a written declaration that it was made under the penalties of perjury, and which BERNARD N. KILPATRICK did not believe to be true and correct as to every material matter. Specifically, BERNARD N. KILPATRICK did not believe the tax return to be true and correct as to every material matter in that: (a) it failed to disclose that he had additional income amounting to at least $172,655, which he well knew at that time he was required by law and regulation to disclose; and (b) it stated on line 22 that his total income was $70,529, whereas, as he well knew at that time, his total income was in excess of that amount.

**All in violation of Title 26, United States Code, Section 7206(1).**

-93-

## COUNTS FORTY TO FORTY-FIVE
(18 U.S.C. §§ 1956(a)(i)(B)(i), 2 -- Money Laundering)

### D-2   BOBBY W. FERGUSON

1.      The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Counts One and Seven above, as if they were set forth in full herein.

2.      On or about the following dates, within the Eastern District of Michigan, Southern Division, and elsewhere, defendant BOBBY W. FERGUSON did knowingly and willfully conduct and attempt to conduct, and cause others to conduct, a financial transaction affecting interstate and foreign commerce, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity – that is, the extortion of *Company L* and *Company A* as alleged in Count Seven -- knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity.  Specifically, FERGUSON caused the following checks, which he obtained by the extortion of *Company L* and *Company A*, as alleged in Count Seven, to be endorsed, then deposited into the following third-party accounts for FERGUSON's benefit:

| Count | Date | Transaction | Amount |
|---|---|---|---|
| 40 | 02/12/07 | Citizens Bank check no. 1429, payable to "A&F Environmental / Johnson Consulting," was endorsed and given to *Law Firm P,* then deposited into *Law Firm P 's* client trust account | $200,000 |
| 41 | 05/23/07 | Citizens Bank check no. 1363, payable to "A&F Environmental / Johnson Consulting," was endorsed and given to *Law Firm P,* then deposited into *Law Firm P 's* client trust account | $120,000 |

-94-

| Count | Date | Transaction | Amount |
|-------|------|-------------|--------|
| 42 | 06/15/07 | Citizens Bank check no. 1436, payable to "A&F Environmental / Johnson Consulting," was endorsed to Ferguson Enterprises, Inc., then deposited into Ferguson Enterprise's bank account | $147,500 |
| 43 | 06/15/07 | Citizens Bank check no. 1486, payable to "A&F Environmental / Johnson Consulting," was endorsed to Ferguson Enterprises, Inc., then deposited into Ferguson Enterprise's bank account | $203,800 |
| 44 | 08/21/07 | Citizens Bank check no. 1832, payable to "Johnson Consultants Services, Inc.," was endorsed and given to *Company U,* then deposited into *Company U's* bank account | $100,000 |
| 45 | 12/12/07 | Citizens Bank check no. 1744, payable to A&F Environmental / Johnson Consulting," was endorsed and given to *Company U,* then deposited into *Company U's* bank account | $150,000 |

**All in violation of Title 18, United States Codes, Sections 1956(a)(1)(B)(i) and 2.**

### COUNT FORTY-SIX
(18 U.S.C. §§ 1956(a)(1)(B)(i), 2 – Money Laundering)

**D-2   BOBBY W. FERGUSON**

1.      The Grand Jury incorporates by reference paragraphs 1 through 6 of the "General Allegations" above, as well as Counts One and Seven above, as if they were set forth in full herein.

2.      As set forth below, in the Eastern District of Michigan, Southern Division, defendant BOBBY W. FERGUSON did knowingly and willfully conduct and attempt to conduct, and cause others to conduct, a financial transaction affecting interstate and foreign commerce, knowing that the property involved in the financial transaction represented the proceeds of some

-95-

form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity – that is, the extortion of *Company L* and *Company A* as alleged in Count Seven – knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity.

3.      Specifically, on or about February 17, 2010, defendant BOBBY W. FERGUSON negotiated, and caused to be negotiated, eleven First Independence Bank Cashier's Checks, listed below, and used $451,304.00 derived from these cashier's checks to (a) open Paramount Bank Account Number xxxxx1749, with an opening balance of $301,304.00, and (b) purchase Paramount Bank Certificate of Deposit No. 2010004568, in the amount of $150,000.00.

| Cashier's Check No. | Amount |
|---|---|
| 17746 | $25,000.00 |
| 17747 | $25,000.00 |
| 17748 | $15,000.00 |
| 17749 | $20,000.00 |
| 17750 | $10,000.00 |
| 17751 | $ 5,000.00 |
| 17752 | $ 9,384.87 |
| 27812 | $85,500.00 |
| 27813 | $85,500.00 |
| 27814 | $85,500.00 |
| 27815 | $85,500.00 |
| **Total** | **$451,384.87** |

**All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.**

**CRIMINAL FORFEITURE ALLEGATIONS**
(18 U.S.C. §§ 981(a)(1)(c), 982(a)(1) & 1963, and 28 U.S.C. § 2461(c))

1.     The allegations contained in Paragraphs 1 through 6 of the "General Allegations,"
above, as well as Counts One through Four and Six through Thirty above, are hereby
incorporated by reference as if they were set forth in full herein for the purpose of alleging
forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(c), 982(a)(1), 1963 and
Title 28, United States Code, Section 2461(c).

2.     Upon conviction of racketeering conspiracy, in violation of Title 18, United States
Code, Section 1962(d), as alleged in Count One of this Fourth Superseding Indictment,
defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, BERNARD N.
KILPATRICK and VICTOR M. MERCADO shall forfeit to the United States, pursuant to
18 U.S.C. § 1963(a)(1)-(3):

   a.     any and all interest defendants have acquired or maintained in violation of

          18 U.S.C. § 1962;

   b.     any and all interest in, security of, claim against, or property or contractual right of

          any kind affording a source of influence over any Enterprise named and described

          herein which defendants established, operated, controlled, conducted or

          participated in the conduct of, in violation of 18 U.S.C. § 1962; and

   c.     any and all property constituting, or derived from, any proceeds obtained, directly

          or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962.

3.     Property subject to forfeiture to the United States pursuant to Title 18, United
States Code, Section 1963(a)(1), (a)(2) and (a)(3), includes all money and property which
represents the value of the interests acquired and the gross proceeds obtained through the

-97-

violation of Title 18, United States Code, Section 1962 as alleged in Count One of this Fourth Superseding Indictment.

4.    Upon conviction of one or more counts of bribery as alleged in this Fourth Superseding Indictment, defendants KWAME M. KILPATRICK and BOBBY W. FERGUSON shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 666.

5.    Upon conviction of one or more counts of interference with commerce by extortion as alleged in this Fourth Superseding Indictment, defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, BERNARD N. KILPATRICK and VICTOR M. MERCADO shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1951.

6.    Upon conviction of obstruction of official proceeding as alleged in this Fourth Superseding Indictment, defendant VICTOR M. MERCADO shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1512.

7.    Upon conviction of one or more counts of wire fraud or mail fraud as alleged in this Fourth Superseding Indictment, defendant KWAME M. KILPATRICK shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. §§ 1341 or 1343.

-98-

8.      Upon conviction of one or more counts of money laundering in violation of 18 U.S.C. §§ 1956 or 1957, as alleged in this Fourth Superseding Indictment, defendant BOBBY W. FERGUSON shall forfeit to the United States (a) any property, real or personal, involved in such offense(s), or any property traceable to such property, and (b) any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses, pursuant to 18 U.S.C. § 982(a)(1).

9.      Substitute Assets: Pursuant to Title 18, United States Code, Section 1963(m), Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), and Title 28, United States Code, Section 2461(c), defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, BERNARD N. KILPATRICK and VICTOR M. MERCADO shall forfeit any of their other property, real or personal, up to the value of property described in Paragraphs 2 through 8 above, if, by any act or omission of the defendant, the property subject to forfeiture:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred, sold to or deposited with a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty.

All in accordance with Title 18, United States Code, Section 1963; Title 21, United States Code, Section 853(p); Title 18, United States Code, Section 982(b); Title 28, United States Code, Section 2461(c); and Rule 32.2, Federal Rules of Criminal Procedure.

10.     Money Judgment.  Upon conviction of one or more violations alleged in this

Fourth Superseding Indictment, the Government will seek a forfeiture money judgment against

defendants KWAME M. KILPATRICK, BOBBY W. FERGUSON, BERNARD

N. KILPATRICK and VICTOR M. MERCADO in an amount as is proved at trial in this matter

representing the total amount of proceeds obtained as a result of defendants' offenses, for which

defendants shall be jointly and severally liable.

THIS IS A TRUE BILL

s/Grand Jury Foreperson
FOREPERSON

BARBARA L. McQUADE
United States Attorney

s/Mark Chutkow
MARK CHUTKOW
Assistant United States Attorney

s/R. Michael Bullotta
R. MICHAEL BULLOTTA
Assistant United States Attorney

s/Linda Aouate
LINDA AOUATE
Assistant United States Attorney

Date:   February 15, 2012