**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

                    **Plaintiff,**          **Case No. 10–CR–20403**
                                       **Hon. Nancy G. Edmunds**

    **v.**

**D–1 KWAME M. KILPATRICK,**

                    **Defendant.**
_____/

**SENTENCING HEARING**

    **Detroit, Michigan – Thursday, October, 10, 2013**

**APPEARANCES:**

**For the Government:**

Mark Chutkow
R. Michael Bullotta
Jennifer Leigh Blackwell
Eric Doeh
Andrew Goetz
Linda Aouate
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226

**Counsel for Defendant Kwame M. Kilpatrick:**

Harold Z. Gurewitz
Margaret S. Raben
Jason Eggert
Gurewitz & Raben
333 W. Fort Street, 11th Floor
Detroit, MI 48226
313–963–2420

                               –   –   –

Sentencing Hearing
Thursday, October 10, 2013

**Appearances(Continued):**

ALSO PRESENT:  Gerald Evelyn
               John Shea

— — —

# I N D E X
- - -

Motion Hearing                                        Page

**Sentencing Hearing**

**Objections to Presentence Report**               7

**Allocution by Mr. Gurewitz**                     40

**Comments by Mr. Chutkow**                        55

**Allocution by the Defendant**                    57

**Sentence of the Court**                          69

**Comments on Forfeiture by Ms. Aouate**           85

**Certification of Reporter**                      87

USA v. Kwame Kilpatrick  Case No. 10-CR-20403-01

**Detroit, Michigan**

**Thursday, October 10, 2013**

**10:10 a.m.**

- - -

**THE CLERK:** United States District Court for the Eastern District of Michigan is now in session. The Honorable Nancy G. Edmunds presiding. You may be seated.

The Court calls Criminal Matter 10-20403, defendant number one, United States of America versus Kwame Kilpatrick.

This is the date and time set for sentencing.

Counsel, please step forward and place your names on the record.

**MR. CHUTKOW:** Good morning, Your Honor, Mark Chutkow for the United States.

**MR. BULLOTTA:** Michael Bullotta for the United States.

**MR. DOEH:** Eric Doeh for the United States.

**MS. BLACKWELL:** May it please the Court, Jennifer Blackwell for the United States.

**MR. GOETZ:** Andrew Goetz for the United States.

**MS. AOUATE:** Linda Aouate on behalf of the United States for the forfeiture portion of the sentence.

**MR. GUREWITZ:** Good morning, Your Honor, Harold Gurewitz on behalf of Kwame Kilpatrick who is seated to my left.

**MS. RABEN:**  Good morning, Your Honor, Margaret Raben on behalf of Mr. Kilpatrick.

**MR. GUREWITZ:**  Your Honor, I'd also like to introduce Jason Eggert, who is an associate in our office, and has certainly assisted us a great deal in the preparation.

**THE COURT:**  Mr. Eggert, good morning.

**MR. EGGERT:**  Good morning.

**THE COURT:**  The record should also reflect the presence of co-counsel, or counsel for co-defendants are also present this morning.

This is the date and time set for sentencing in this matter.  There's been a lot of paper filed, a number of objections, responses, replies, presentence reports obviously prepared by the probation department, and before I say anything else, I would like to thank Charmarie Green who has worked very, very hard to prepare this case for this proceeding.

And as a matter of procedure, it seems to me that we need to kind of sort things out a little bit because there really have been two separate sets of objections filed that need to be addressed.  There were the original objections filed to the presentence report which kind of go through paragraph by paragraph and make certain objections.  Government filed responses to that.

Then, subsequent to that, there were some additional overall objections filed by Mr. Kilpatrick's counsel to the

calculation of the guidelines and some of the related guideline issues.  That has also been responded to by the government just this morning.  I did have an opportunity to read that, so -- and there was a reply filed, I guess maybe yours was filed yesterday and the reply filed this morning.  In any event, I did have an opportunity to read both the government's response and the defendant, defendant's reply.

So we need to take these up, we need to take all of these up, but I think probably the best way to do it is to take up the specific, maybe we take up the general objections first. Well, I don't really care.

Which way would you prefer to do it, Mr. Gurewitz or Ms. Raben?

**MS. RABEN:**  Your Honor, I'm not sure what you're talking about, general versus specific.

**THE COURT:**  Well, I had objections that went through the presentence report paragraph by paragraph.

**MS. RABEN:**  Right.

**THE COURT:**  And then I had a separate set of objections that I reviewed that was characterized Objections to Guidelines Calculations, which wasn't so much a paragraph-by-paragraph analysis as it was an overall objection. Although paragraphs were mentioned, it was an overall objection to the calculation of the guidelines.

**MS. RABEN:**  They were, Your Honor.  They were more

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

my legal arguments about the scoring of the guidelines.

THE COURT: Okay.

MS. RABEN: Which the probation office is not in a position to evaluate.

THE COURT: All right. So which one do you want to take up first?

MS. RABEN: Why don't we take up the legal objections because I think that they are the ones that go to the heart of the scoring of the guidelines.

THE COURT: That's fine. Before I ask you to step forward, I assume you have had an opportunity to review all of the objections and the Presentence Investigation Report with Mr. Kilpatrick.

MS. RABEN: Yes.

THE COURT: All right. Come forward, please.

MS. RABEN: Thank you, Your Honor.

THE COURT: You're welcome.

(10:10 a.m.)

MS. RABEN: I've raised a series of objections to the facts used to score the sentencing guidelines, and that's what I want to talk about here, and the first thing I want to object to is the use of the number of $9,654,553 as the amount of value of benefit received which for purposes of the guidelines is analyzed as though it was loss in this case. And that kicks up Mr. Kilpatrick's guideline range by 20 levels.

My overarching objection to that is that there is insufficient reliable evidence in the record to assess this against Mr. Kilpatrick.  I understand that all the Court has to do is make a reasonable estimate, but that reasonable estimate has to be based on sufficient and reliable facts, and those facts should primarily come of the evidence at trial, although I am aware that the Court may use other sources of evidence.

Our argument here is that so many of those other sources are unsubstantiated, have never been even introduced into evidence at trial and, therefore, are unreliable.

The government's argument basically comes from the idea that all of the contracts that were part of the RICO conspiracy in Count 1 should be used for purposes of this value assessment.  Our problem with that is that the jury makes no specific determination of most of those amounts.  The parts in Count 1 that were charged as substantive offenses, of course, we do have the jury verdicts on those, and the Court could determine that the amounts in Counts 2 through 4 and 9, because those are convictions against Mr. Kilpatrick, are sufficiently established.

Counts 7 and 8 were not convictions.  The jury specifically said no consensus as to Mr. Kilpatrick.  So we think that the amounts stated in Counts 7 and 8 for purposes of this loss calculation are as questionable as the amounts generally stated as part of Count 1, because while there may be

some evidence of those, there is insufficient evidence that those should be assessed against Mr. Kilpatrick.

Our second argument has to do with that 10 percent calculation which was originally higher, and then, because of objections raised to the draft presentence report, has now been modified to 10 percent. Our problem with that is that what it relies on is by and large not even evidence. It's just statements. The evidence in the record is that the percentage of profit, and I'm not sure that that word "profit" is being used in a technical sense, all right, as much as it's being used in the sense of what the vendors intended to gain above and beyond the revenues which they used to pay their own expenses, that that number is, generally speaking, 3 to 5 percent, and I went back and looked at Kathleen McCann's testimony.

**THE COURT:** Frankly, I don't know how you could look at Kathleen McCann's testimony and come up with 3 to 5 percent. I mean, I've read and reread and reread her testimony, which very clearly states that Mr. Ferguson was demanding 3 percent of the $50 million total revenues as a guarantee on the project, and that as a matter of compromise, what Inland finally agreed to was to give him $10 million worth of work at a guaranteed 15 percent profit which would have been the same as 3 percent of the $50 million, but a 15 percent profit on work that he actually did, netting him $1.5 million on that

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

project. That's how I see that so...

**MS. RABEN:** Well, Your Honor, I see it differently, but you get to make the call.

**THE COURT:** I get to rule today.

**MS. RABEN:** You do.

**THE COURT:** Yes.

**MS. RABEN:** Right. The other part of that, then, is, is it appropriate to assess 10 percent on all of the other contracts, and while the government says that the evidence is overwhelming and the evidence is clear and the evidence is in the record, I have not seen that they have cited any of that evidence.

**THE COURT:** Well, they submitted a number of Mr. Ferguson's own documents which indicate 15 percent, 20 percent administrative fee, overall fee -- in fact, several of them actually say "profit," and there's nothing that lists less than 15 percent. There are probably five or six different exhibits in the record in addition to the exhibits that Carol Paszkiewicz testified to and put into evidence.

So, but the exhibits submitted by the government with Mr. Ferguson's -- with their memorandum on Mr. Ferguson, Exhibits B through H, I believe, do have profit lines on them. No profit line is less than 15 percent, and they're his own documents. That's not something that the agents were extrapolating.

MS. RABEN:  I'm not sure that what Mr. Ferguson characterizes his numbers as, all right, is, in fact, sufficient evidence for tagging Mr. Kilpatrick with those amounts.

THE COURT:  Well, those are separate questions, aren't they?

MS. RABEN:  They are.

THE COURT:  That is, what was Mr. Kilpatrick -- what is he liable for based on his involvement and his conviction in the conspiracy count.  You make an argument based on foreseeability that somehow suggests that he had to have an advanced perception of what the profit level was going to be. To the contrary, I think the law only requires that the acts and omissions of his coconspirator be foreseeable to him, and I think there is a ton of evidence in the record of that.  I couldn't find anything to suggest that the actual percentage level had to be specifically foreseeable to him; only that the overall acts and omissions were, and that the amount of profit allocated to the coconspirator is based on reasonably reliable evidence.

It seems to me that Mr. Ferguson's own documents constitute the reasonably reliable evidence bolstered in this case by the testimony of Carol Paszkiewicz who went through and put all those documents together in several summary exhibits.

MS. RABEN:  I --

**THE COURT:** So I'm going to stick with that 10 percent number.

**MS. RABEN:** All right. Then the question becomes, is it reasonably foreseeable to Mr. Kilpatrick? Was there proof that Mr. Kilpatrick was steering Ferguson's company into these vendor contracts? Absolutely. Is that implicit proof of what the specific facts of the steering meant? I don't think so.

**THE COURT:** I don't think the law requires that. I think the law requires simply that the acts and omissions of the co-defendant in connection with the acts of conspiracy be reasonably foreseeable. Not only were they reasonably foreseeable, they were at the heart of what Mr. Ferguson and Mr. Kilpatrick were convicted of conspiring of together.

**MS. RABEN:** I agree, Your Honor, okay, and the proofs necessary to establish the conspiracy, and as I understand the RICO conspiracy, the jury was instructed that they could find Mr. Kilpatrick guilty of the RICO conspiracy if he agreed that two acts would be committed, but then we start cascading down into all these specific details, and I have not seen evidence that, in fact, Mr. Kilpatrick knew what Mr. Ferguson was doing. I think for sentencing purposes there's a big difference between setting up a system whereby the Ferguson companies are going to get part of this work, and then the evidence as to what exactly Mr. Ferguson was doing

beyond the scope of getting paid to do part of the work.

THE COURT:  I don't know how you can say that he was a coconspirator and convicted of coconspiracy in assuring that Mr. Ferguson was made part of these contracts but that the money that Mr. Ferguson made from the contracts somehow was not foreseeable to him.  I mean, there's no purpose of putting Mr. Ferguson into these contracts if it wasn't for the purpose of making money, and the only question then is what's the reasonable amount of money that can be inferred that Mr. Ferguson wrongfully obtained as a result of this conspiracy.

I've already explained why I think the 10 percent is a reasonable number, and I just don't think your argument that he couldn't have foreseen that he was going to make money makes any sense at all.  So --

MS. RABEN:  Are you saying that Mr. Kilpatrick, then, stands in the shoes of Mr. Ferguson for purposes of this determination, or that -- because our argument is that he should not be assessed that total amount of money if for no other reason he wasn't convicted of Count 7 and 8.

THE COURT:  Well, I'll get to that in a moment. What I'm saying for right now is that I disagree with your analysis of the foreseeability requirement, and I disagree with your objection that the 10 percent is not reasonably attributable to Mr. Kilpatrick.

On the issue of how I calculate the loss under the extortion and RICO counts, I'll let the government respond first, and then I'll comment on how I've done that.

**MS. RABEN:** All right. Well, I have stated my arguments as clearly as I can in my pleadings. I know the Court has read them, and do you want to give the government a --

**THE COURT:** If you're done with this part of your argument --

**MS. RABEN:** I am, yes.

**THE COURT:** -- then I'll let the government respond and we'll go on to the next.

**MS. RABEN:** Thank you, Your Honor.

**THE COURT:** Thank you, Ms. Raben. Mr. Chutkow.

(10:21 a.m.)

**MR. CHUTKOW:** Thank you, Your Honor. We don't have much to say. We have briefed this issue, and I think Your Honor has a correct interpretation of 1B1.3, the relevant conduct section. I would just add, as far as how conservative we were in assessing Mr. Ferguson's profit margins, that an overall view of the records in this case showed typically a 20 percent profit margin, but we decided, out of an abundance of caution, to go to this lower figure so that there would be no question.

The other thing I would point out is this is done by

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

a preponderance of the evidence, it's not the beyond a reasonable doubt standard at trial, and in the chart that we had given the Court that formed the basis for the 9.6 million figure, Mr. Kilpatrick got -- all of these particular contracts were included as overt acts in the Count 1 conspiracy for which he was convicted except for Counts 7 and 8 which deal with this 849 outfalls contract that was won by Lakeshore Engineering, and they received -- or they paid $1.7 million in no-show payments to Mr. Ferguson.

I would just offer that Mr. Kilpatrick would have been -- foreseen this as well because he was intimately involved in the cancellation of the preceding contract, contract 1361, which basically set the stage for Lakeshore Engineering realizing that there was no deal without Mr. Ferguson and that they were going to have to pay this money.

So unless you have any questions for me, that's all I have.

**THE COURT:** No, I don't. Thank you.

**MR. CHUTKOW:** Thank you.

(10:23 a.m.)

**THE COURT:** All right. I want to comment on how I have calculated the loss on this so it's clear going forward.

First of all, I want to say that I agree completely that the $9.6 million is a defensible number, foreseeable to

Objections to Presentence Report
Thursday, October 10, 2013

Mr. Kilpatrick based on the 10 percent profit figure, that these contracts were culled out as overt acts in Count 1 and that they were specifically found by the jury with respect to, some of them were specifically found by the jury in Counts 2, 3, 4 and 9.

For my purposes in calculating the guideline, I have taken a more conservative approach which I do not believe is required by the law, but which I basically feel is the most possible conservative approach that can be taken by this, and that is to take only the contracts which were specifically found to be contracts of conviction in Counts 2, 3, 4 and 9.

If you take those numbers and eliminate all of the other numbers from the calculation, you get the numbers as follows: On Counts 2 and 3 which was the sewer lining, characterized as the sewer lining contract, it was sewer repairs done on an as-needed basis, and then Count 3 was the sinkhole component of contract 1368, and the amendments to 1368. The total profit based on a 10 percent profit margin is $2,082,431. And those were culled out as overt acts 1, 2, and 3 in Count 1 and they cover Counts 2 and 3 for which the jury specifically found that Mr. Kilpatrick was guilty.

On overt act number 9, Count 4, Baby Creek and Patton Park, the amount of loss is $1,349,000. If I didn't already say, that's Baby Creek and Patton Park. I don't have the contract number right in front of me at the moment. That

also was culled out as overt act number 9 in Count 1, and separately a count of conviction in Count 4.

Finally, on Count Number 9 which were described as overt acts 5, 6, and 7, the east side water main and the east side sewer repairs, there are two separate components to that amount of loss, $330,992 going to Ferguson Enterprises based on the 10 percent figure I had used on the others, and then $822,000 to Xcel, one of Mr. Ferguson's other companies, which was straight profit, not based on 10 percent, it was just a straight payment.

The total, then, is, for those four matters that I've just culled out, $4,584,423. What that does is take this down one level in the sentencing guidelines. That is, instead of 9.6 million, we're looking at 4.6 million, which puts us squarely at an 18 level enhancement rather than a 20 level enhancement.

So in calculating the final guidelines in this matter, I have eliminated the additional $5 million of profit that is absolutely, in my opinion, attributable to Mr. Kilpatrick through Mr. Ferguson, and gone instead with the $4.6 million, just for purposes of calculating the guideline.

Okay. Next objections?

(10:28 a.m.)

**MS. RABEN:** Thank you, Your Honor. My next set of objections have to do with a couple of enhancements which I

USA v. Kwame Kilpatrick    Case No. 10-CR-20403-01

argue are impermissible double counting in the context of this case, and that's the only way you can consider impermissible double counting, all right. It's not a global objection to anything. It's an objection based on the facts of this case, and my first objection is to the argument that the plus 4 enhancement for elected public official, which is found in Paragraph 103 is an impermissible double counting of the enhanced base offense level of 14, and my argument relies on the definitional parts of public official listed in the commentary, and I've put that, of course, in my brief.

The Sixth Circuit, I will observe, seems to have a somewhat more generous view of what is impermissible double counting than some of the other circuits, and I have relied on the case law of Farrow and Levy which clearly says that when the same set of facts is used to enhance -- or to set a base offense level that is then used to enhance the base offense level, that this is impermissible double counting, and I see that in terms of the bump from 12 to 14 for the base offense level and then the enhancement of 4 because he's an elected public official.

I wish there was more case law on this, but what I know about Sixth Circuit case law, or all circuit case law, is these are skewed subsets of cases because when the district court denies the enhancement, that never gets appealed. The only thing that ever gets appealed is when the district court

imposes the enhancement, and so you get a series of cases that are fact-specific in which the Sixth Circuit sometimes says, "Yeah, this is okay."  In the case of Farrow and Levy, the Sixth Circuit said, "No, this is not okay."

And that's the argument that I'm making here, that the enhancement of plus 4 for elected -- for Mr. Kilpatrick's conduct as the elected mayor of Detroit is the same thing that gets him the bump up from 12 to 14.

**THE COURT:**  Well, let me ask you this, because I've read this over and read your cases over, as well.  I mean, you can be a 14 as a public official at a very low level.  I mean, you can accept a bribe or extort favors at a, as a public official without being the mayor of the City of Detroit.  You can --

**MS. RABEN:**  I agree, but --

**THE COURT:**  Okay.

**MS. RABEN:**  -- the impermissible double counting argument is case specific.

**THE COURT:**  I understand your argument that, you know, because he's a public official he's a 14 --

**MS. RABEN:**  Well -- I'm sorry.

**THE COURT:**  -- and then you can't bump him up four additional levels because he's a high-level public official.

**MS. RABEN:**  Actually, my argument is he's a public official by virtue of this conduct as mayor of Detroit.  That's

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

what gets him the 14 rather than the 12.

**THE COURT:** Right.

**MS. RABEN:** And to then add four more levels to that because he is elected --

**THE COURT:** A high-level.

**MS. RABEN:** -- elected mayor, okay, is -- my argument is this is impermissible double counting because it's the very same conduct being used to set the base offense level and score the enhancement.

**THE COURT:** All right. Let me hear from the government. Thank you, Ms. Raben.

(10:35 a.m.)

**MR. CHUTKOW:** I'll be very brief on this. I think Your Honor understands the concept here that a high-level, an elected official or an official that is in a sensitive decision-making position by his very nature is a more grave circumstance. That's what warrants this upward adjustment of four points. I mean, it was obviously specifically contemplated by the guidelines commission in the very structure of 2C1.1 itself, and it's supported by a fairly recent 11th Circuit decision of 2011, *United States vs. White* that is in our sentencing memoranda.

**THE COURT:** And I agree with the government here that the structure of the guidelines is such that any public official starts at a 14 and then it's bumped up four levels if

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

it happens to be a high-level elected public official with substantial decision-making possibilities, so this objection is overruled.

MS. RABEN: My next objection is to another enhancement, and that is the plus 4 for leadership, and again, I rely on my brief, and, in particular, I rely on the analysis in the decision in the Gibson case, that when the base offense level is set because of someone's leadership that you -- it is not appropriate to score the 3B1.1 leadership analysis -- or leadership enhancement, and the government claims that the Gibson case is distinguishable because the offense of conviction required you to be a leader, a decision maker within the statute.

Improper double counting is not based on the statute. It's based on the scoring of the guidelines. It looks at the base offense level, it looks at the conduct being used to score the leadership enhancement.

THE COURT: Well, I'm having a hard time kind of understanding your objection here, because clearly the offense of extortion for which Mr. Kilpatrick was convicted on several different counts can be accomplished as a solo matter by an elected official, and history is replete with examples of that. In this case, what the enhancement says is this extortion was not just a solo matter. This was a plan or scheme that involved at least five other people, at least four other

people, and I don't think we'd have to think too hard to think of some of the others who were involved in this scheme that, who testified at trial or who were testified about at trial.

So it's hard for me to see how this is double counting. It's not double counting, and you can have extortion by one person and that would be the end of it. That's not what this was.

MS. RABEN: My argument is that it's impermissible double counting because you've got the tick up from 12 to 14, you've rejected my argument about the elected public official decision maker part of this, all right.

THE COURT: So once I do that, you say that that automatically means he's already involved in a scheme involving five or more people, once he's a high-level decision maker? I want to make sure I understand the argument.

MS. RABEN: And I appreciate the opportunity to clarify this. My argument goes to the issue of leadership, all right, of the role in the offense enhancement.

THE COURT: Okay.

MS. RABEN: And the plus 4 enhancement for decision making, all right, already encompasses the same stuff that's being -- I'm sorry, the same facts that's being used to score the leadership enhancement. That's the argument, Your Honor.

THE COURT: Thank you, Ms. Raben.

MS. RABEN: And if you had granted the -- or if you

had denied the enhancement for elected public official, all right, I would not have this argument.

THE COURT: Okay.

MS. RABEN: That's my position. They're alternative arguments.

THE COURT: All right. Thank you. Mr. Chutkow.

MR. CHUTKOW: Your Honor, I have nothing to add unless you have any questions for us.

THE COURT: No, and I just see this differently. I see this as two completely separate issues; one being the enhancement that we talked about previously for elected public official with substantial decision-making capability, and then the leadership role involving a plan or scheme with a number of other people, five other people. I think they're both appropriate and will include both of them. Thank you.

More objections?

MS. RABEN: Not objections. Arguments for variance or departure.

THE COURT: That's fine. Let's go to that.

MS. RABEN: Okay. I've submitted to the Court my arguments regarding a sentence that would vary from the sentencing guidelines or depart from it. The bottom line is you kind of get to the same place but they are technically two different arguments and two different analyses.

The primary argument, of course, is the

unreliability of the fraud tables that become the tail that wags the dog of any sentencing in which the primary issue is amount of money.  And I have submitted rather extensive argument to the Court about the fraud table in 2B1.1 which is imported into the 2C1.1 guideline, as it is not a determination made by the Sentencing Commission based on any exercise of their expertise, relying on past data, relying on past sentencing, relying on any kind of deterrence rationale.  That fraud table is not based on any empirical evidence that increasing the sentencing guidelines means greater harm, more deterrence or any deterrence, actually.  I have not seen any determination that increasing sentences in money cases in fact acts in any deterrence way.

The fraud table, at least pre-Fair Sentencing Act, was tied to the drug guidelines, and the drug guidelines themselves, as we clearly know from Kimbrough and Spears and Gall, that the drug guidelines themselves are not tied to any sentencing expertise and so you've got this tumbling of the fraud guidelines upwards because there's some idea that they should be tied to each other.

There's also a really questionable aspect of the gain and loss guidelines as a proxy for anything, as the escalation of the sentencing guidelines presumably means something.  There's absolutely no evidence that the escalation of the fraud guidelines based on amount of money, in fact, is a

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

proxy for anything in terms of sentencing, and I've also cited the Court to what is clearly absurd results of the scoring of the money guidelines as they currently exist in terms of violent crime.

Mr. Kilpatrick's sentencing guidelines far exceed sentencing guidelines for people convicted of what anybody would consider violent crimes, and it was bad enough if the guidelines are scored as life, but given the probation department's now scoring the guidelines is 368 years --

**THE COURT:** Months.

**MS. RABEN:** No, no, ma'am, years.

**THE COURT:** 368 years?

**MS. RABEN:** Yes, ma'am.

**THE COURT:** No -- yes, fair to say. Believe me, I didn't do 368 years.

**MS. RABEN:** Your Honor, my own assistant said to me, "Don't you mean months?"

**THE COURT:** Right.

**MS. RABEN:** And I said, "No."

I can't even think of an adjective, okay, except to say that this just proves the argument about the arithmetic obsession of the sentencing guidelines as leading to just absurd results, and that's, that's stated.

I've also argued that the guidelines pile on, and in this case, they have piled on and piled on and piled on because

of Mr. Kilpatrick's conduct as mayor of Detroit, and ten levels of those guideline ranges, of that -- the guideline scoring is based on his conduct as mayor of Detroit, and while the guidelines allow this, and this Court, in fact, has found that those are appropriate, I think the Court has to consider what this does to the guideline range.  It's the same conduct for everything, and it's being scored to raise his guidelines by ten levels, and I think that's an argument for variance.

The Sentencing Commission refers to this as factor creep, and while they have not done anything about it, certainly courts recognize that it exists, recognize it's a basis for a variance and is an appropriate basis of variance in this case.

I've also argued that Mr. Kilpatrick's criminal history score overstates his record, and I've -- seems to me that the rationale that one learns something from each successive pass-through of the courts, all right, punishment, deterrence, all right, that wasn't here because of the way the state cases interlocked and got adjudicated.

The sentencing guidelines themselves tell the Court that you can consider this as a reason to depart from the correctly scored guideline range.  So my argument has two parts.  One has to do with the overassessment of the two state cases, and the second part has to do with the, a matter that the probation office suggested which is the two points for

Case 2:10-cr-20403-SJM-MKM ECF No. 492, PageID.16177 Filed 10/29/13 Page 26 of 88   26
Argument for Variance or Departure
Thursday, October 10, 2013

offense committed on -- while under supervision which relates only to Count 36, in fact, maybe an uptick that the Court can consider and decide is not appropriate.

So that's what I have on terms of variance and departure.

**THE COURT:** Thank you. Government like to respond to that, Mr. Chutkow?

(10:48 a.m.)

**MR. CHUTKOW:** Yes, thank you, Your Honor. I would just say up front that we disagree with the arguments about the fraud guidelines. The commission specifically was attempting to create some consistency with white collar cases and other sorts of crimes out there, and I think that's an important policy objective.

That being said, we have to acknowledge from the cases that we have cited as comparable cases around the country of major local and state officials who have been convicted of corruption cases very similar to this, and oftentimes with similar facts, they were not sentenced to life in prison in those cases, and we acknowledge that and assume that there was some sort of downward variance that allowed the courts to go from some of the higher sentences that were contemplated by the guidelines in those cases to the sentences that were actually achieved.

So we leave it to the Court's discretion as to what,

if there is an appropriate variance in this case, whether it be an overstatement of the criminal history or otherwise. And unless you have any other questions, that's all we have on that.

THE COURT: No. Thank you.

Is there anything else from counsel before I seek allocution? Actually, I'm going to give each side an opportunity to speak again before I'll ask for allocution from the defendant.

MS. RABEN: Your Honor, I believe Mr. Gurewitz would like to address the 3553(a) factors with the Court.

THE COURT: That's fine. Do you want to take a break before we do that, Mr. Gurewitz?

MR. GUREWITZ: Your Honor, just to be clear about that, what I'd like to do is to address the Court as part of allocution.

THE COURT: Yes.

MR. GUREWITZ: If that's the next part. There were some other matters that we raised by way of objection. I don't know if you want to address those or not.

THE COURT: Was that, yes, you want to raise those now? There were a number of objections that did not affect the sentencing guidelines that went to language in the presentence report, that sort of thing. Do you want to take those up? Do you want to --

MS. RABEN:  I would, yes, Your Honor.

THE COURT:  All right.

(10:49 a.m.)

MS. RABEN:  Your Honor, we raised objections to some of the language in the presentence report as really being nothing more than the government's point of view and, in fact, belied by some of the evidence in the case.

Our first objection has to do with the word "oversee," all right, which I think implies a finger on the pulse at all times when, in fact, there's no evidence of that, and, in fact, there is evidence that in the record --

THE COURT:  You're talking about Paragraph 13, just for the record, right?

MS. RABEN:  Yes, I'm sorry.

THE COURT:  "As mayor, Kilpatrick oversaw several city departments --"

MS. RABEN:  And rather than me talk about our objections, we stated them, and -- as objections to the language in the presentence report, and Ms. Green declined to change.

THE COURT:  Well, there were some objections in which the probation department did insert language that you requested.

MS. RABEN:  She did, yes.

THE COURT:  And so some of these objections have

been resolved --

MS. RABEN:  Absolutely.

THE COURT:  -- either by -- all right.  But there are a few that, to the extent that they haven't been resolved, do you still want me to rule on them?

MS. RABEN:  Yes.

THE COURT:  Go ahead.

MS. RABEN:  All right.  Well, I guess --

THE COURT:  "Oversee," do you want that to be the first?

MS. RABEN:  Yes.

THE COURT:  Okay.  That's your first stated objection, and I overrule that objection.  I think the evidence is pretty clear that Mr. Kilpatrick as mayor of the city did, in fact, oversee several city departments.

MS. RABEN:  All right.  Our Objection Number 2 is Paragraph 14, the generalized assertion that he used city departments as his personal bank account.  There's no evidence of embezzlement here.  There's no evidence that city departments were funding personal expenses.  The Kilpatrick Civic Fund, yes, all right, but city departments, no.

THE COURT:  Mr. Chutkow, do you wish to respond to that?

MR. CHUTKOW:  We don't object to having that language struck.  There's more aspects to this objection that

we would pose.

THE COURT:  Right.  Let's -- we'll revise that to say, "Kilpatrick used the Kilpatrick Civic Fund as his personal bank account," and take out the reference to the city departments.

MS. RABEN:  Thank you, Your Honor.

Objection Number 3 relates to Paragraph 15.

MR. CHUTKOW:  May I interrupt one moment, Judge?

THE COURT:  Yes.

MR. CHUTKOW:  There is another aspect of the objection.  Number 2 has to do with whether Mr. Kilpatrick steered contracts to Mr. Ferguson, and we would argue and we put that in our response that there was, in fact, plenty of evidence in the trial transcript that would support that, and so we would oppose any sort of changes to that part of the objection to Number 2, paragraph 14 of the PSI.

THE COURT:  I would agree with that.  I've read Objection Number 2.  I agree with the language -- that we strike the language we've already talked about and leave the rest as is.

MS. RABEN:  Yes, and that's all we ask at this time.

THE COURT:  All right.  Okay.

MS. RABEN:  Regarding Paragraph 15, our objection is to this, "Numerous witnesses testified that Kilpatrick pressured city vendors to hire Ferguson."  I don't see any

evidence that Kilpatrick dealt directly with city vendors.  Did the vendors believe they were being pressured?  I think that's quite clear.

THE COURT:  I don't think it says directly anywhere in there, and I believe that the statement is accurate as it stands, so we'll leave that.

MS. RABEN:  All right.  Thank you, Your Honor.

The next objection goes to Paragraph 16 which was partially revised by the probation department, and I think -- all right.

THE COURT:  We're going to leave that one alone?

MS. RABEN:  Yes, in light of --

THE COURT:  All right.  The revised language?

MS. RABEN:  -- the revised language, yes.

Paragraph 18, I don't think that's what Derrick Miller testified to, all right, and, in fact, Derrick Miller's testimony was that if there was work for, an opportunity for Bobby Ferguson then, yes, we were supposed to help Bobby.  I think that is a different tone to the idea that Kilpatrick made it clear within his administration that if a city contract was up for grabs, Bobby Ferguson needed to be made part of it.

I've gone back and reread some of the testimony, and I, while I raise the objection, I think it's probably not well taken.

THE COURT:  All right.  We'll leave that as it is.

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

**MS. RABEN:** And then going down to Objection Number 8 which refers to --

**THE COURT:** 6 and 7, it looks to me like they got resolved.

**MS. RABEN:** We did, yes, those were resolved with the assistance of the probation department.

Objection Number 8, this again has to do with the determinations of money amount and, of course, this objection was made to the draft presentence report which, instead of using the amount of 10 percent, used 26 percent as the percentage, so Number 9 doesn't even apply anymore.

**THE COURT:** Number 8 doesn't apply.

**MS. RABEN:** Number 8 doesn't even apply anymore.

**THE COURT:** I ruled on the part that was still viable, and the rest of it has been resolved.

**MS. RABEN:** All right. I would like to say, though, that all of this testimony about what Dennis -- is it Oszust?

**THE COURT:** Oszust.

**MS. RABEN:** Oszust says, Dennis Oszust says, Dennis Oszust says, Dennis Oszust told me. Dennis Oszust did not testify at trial, and while I understand that the Court let the testimony come in over objection, to use it as his -- to use his testimony as established fact for purposes of sentencing --

**THE COURT:** I don't think I did let it come in over objection. It's just being used by the probation department to

substantiate the analysis on these paragraphs.

**MS. RABEN:**  Then that's all the worse, all right.

**THE COURT:**  Well --

**MS. RABEN:**  And it's the objection to the use of unsworn --

**THE COURT:**  I didn't rely on any of Dennis Oszust's testimony.  I mean, the guideline, the law with respect to presentence reports is that you can use interviews with witnesses or any other extraneous evidence, grand jury testimony, outside exhibits, bank accounts, et cetera, to formulate the appropriate sentence.  So it's not improper to use Mr. Oszust's testimony, but I will tell you that I did not find it necessary to rely on Mr. Oszust's testimony to come up with the numbers on the contracts 1361 and 1368 because there was plenty of other evidence in the record of it.

**MS. RABEN:**  All right.  Thank you, Your Honor.

With regard to our Objection Number 9, we've asked that the presentence report be amended to include the testimony at trial that, wherever this information came from, all right, that the amendment -- I believe this is referred to Amendment Number 4 of 1368, I think that's what that talks about.

**THE COURT:**  Right.

**MS. RABEN:**  And that the probation department takes the position that that amendment was held up until after Inland reached --

THE COURT:  An agreement with Mr. Ferguson.

MS. RABEN:  -- an agreement with Mr. Ferguson, and that is not the testimony at trial.  The testimony at trial is that Amendment Number 4 was signed before Inland concluded its reluctant negotiations with Mr. Ferguson, and to infer that Mr. Ferguson had to be satisfied before Amendment Number 4 is signed is not supported by the evidence, and that's our objection here.

THE COURT:  Okay.  Mr. Chutkow.

(10:59 a.m.)

MR. CHUTKOW:  Yeah, I would disagree with that characterization.  Bernard Parker testified at trial as to conversations he had had with the former mayor and with Derrick Miller about the holdup of this contract, and so did Derrick Miller.  There were also some emails that were introduced at trial that made references to this contract being held up until issues between Inland and Ferguson Enterprises were resolved related to this Amendment Number 4, so that is certainly plenty of evidence to support the jury's verdict in the case and this assessment, that is, what has been described in this PSI.

THE COURT:  I agree.  There was some element of ambiguity in Mr. Parker's testimony, but I agree with the government's analysis of it, and I'm overruling that objection.

MS. RABEN:  All right.

THE COURT:  Number 10 was resolved, is that right,

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

that paragraph was stricken, Paragraph 56?

MS. RABEN: Yes.

THE COURT: Okay.

(11:00 a.m.)

MS. RABEN: Our objection to Number 11 -- our Objection Number 11 is based on the use of this unattributed and --

THE COURT: The 10 number?

MS. RABEN: The 10 percent, yeah, the 10 percent thing.

THE COURT: I've ruled on that already. So that objection is overruled.

MS. RABEN: Thank you.

Actually, Your Honor, we're withdrawing that because it's based on the 26 percent that was the original figure.

THE COURT: All right.

MS. RABEN: Objection Number 12, we object to the inference or the assumption being drawn that because there was something on Mr. Kilpatrick's daily calendar about a meeting with the principal of Walbridge that --

THE COURT: Mr. Rakolta.

MS. RABEN: Mr. Rakolta, that the meeting actually occurred. There's no evidence that that meeting actually occurred, and I don't believe there's any text messages or anything else that would indicate that that meeting actually

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

occurred, and that's our objection to this specific fact statement.

        THE COURT:  Mr. Chutkow.

                                    (11:01 a.m.)

        MR. CHUTKOW:  Just a few points.  We have interview reports that we have provided to the defense that specifically -- from Mr. Rakolta where he talks about this very incident.  Bernard Parker testified to it at trial, said that Mr. Ferguson had made arrangements for Mr. Rakolta and Mr. Kilpatrick.

        There is a government exhibit that relates to it, WA2-1A, and there are additional emails between Mr. Rakolta and his subordinate, Mr. Hausmann, which had been provided to the defense which also supports that this meeting, in fact, took place.

        THE COURT:  I agree.

        MR. CHUTKOW:  Your Honor, if I could, just one aside, just for the record, I would point out that this particular count of conviction, the attempted extortion of the Oakwood CSO was a $140 million contract.  Mr. Ferguson was attempting with the assistance of the mayor to get 35 percent of that.

        The guidelines allow the Court to assess an attempt in terms of the overall value of the contract here, 35 percent of $140 million is in the range of about $45 million, which

10 percent of that would be $4.5 million. And that's $4.5 million that the Court could have assessed in this case as a calculation of the loss, which the Court didn't, and shows the conservative nature of the assessment.

**THE COURT:** I agree. I mean, I think it could have been assessed and, I think, I mean, it would have held up, but I'm not going to.

**MS. RABEN:** Again, Objection Number 13 is withdrawn because it's based on the 26 percent.

**THE COURT:** Right.

**MS. RABEN:** Which is no longer the operative figure.

**THE COURT:** Also part of that objection was to the hearsay testimony of Kim Harris, but I ruled on that at trial so --

**MS. RABEN:** You did, yes, and we don't expect anything different at this phase.

Objection Number 14, again, the Court has resolved this with its decisions about the amount of loss.

Our Objection Number 14 --

**THE COURT:** 14 has, again, been resolved.

**MS. RABEN:** It has, yes.

15, again, the Court has resolved this, not to our satisfaction, but resolved it.

Our Objection Number 16, the Court has resolved that, because that was the argument about the impermissible

double counting.

Objection Number 17, the Court has resolved that with its decision about the enhancement for role in the offense. And same as to Number 18. I've made my arguments, Court has ruled.

**THE COURT:** Okay.

**MS. RABEN:** Thank you, Your Honor.

(11:05 a.m.)

**THE COURT:** Thank you, Ms. Raben.

All right. Let's take a break before we go on to allocution.

**THE CLERK:** All rise. Court is in recess. Court will reconvene at 11:20.

(Recess taken 11:06 until 11:27 a.m.)

**THE CLERK:** All rise. Court is now reconvened. You may be seated.

**THE COURT:** Mr. Gurewitz, I would be happy to hear anything you have to say on behalf of Mr. Kilpatrick before I have him speak on his own behalf.

**MR. GUREWITZ:** Thank you, Your Honor. Will we have an opportunity to respond to the government's comments if we are to go first?

**THE COURT:** Yes. Why don't you speak, then Mr. Chutkow or someone else from the government can speak, I'll let you go again, and then Mr. Kilpatrick, of course, is

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

welcome to allocute on his own behalf.

**MR. GUREWITZ:** Your Honor, I'd like to first say thank you particularly for allowing us the time that you did to get to this day. It was obviously quite an undertaking for Ms. Raben and myself to immerse ourselves in these facts. I'm not sure we're yet at the point where we would call ourselves the masters of those facts, but we certainly are a lot better prepared now than we would have been at an earlier date.

**THE COURT:** I'm happy to have given you the extra time, and thank you for the hard work you both did on this matter.

**MR. GUREWITZ:** We have submitted five letters to the Court on behalf of Mr. Kilpatrick. We emailed four of those last night, and I delivered a fifth one this morning.

**THE COURT:** I have those, thank you.

**MR. GUREWITZ:** The overall goal of sentencing, as the Court is very well aware, is to determine a sentence that is sufficient but not greater than necessary. In part, perhaps because I didn't sit here throughout all of the trial, and because I didn't spend the probably almost three years reviewing the discovery before it started, my view might be a little bit different, but it seemed to me, particularly when I read the presentence report and then again the government's sentencing memoranda, that there was a lot of information that was addressed that was not part of what I had believed was the

trial.

The sentencing decision that the Court must make is to be an individualized one based upon the consideration of all the relevant, appropriate factors for Mr. Kilpatrick. We have outlined those in our sentencing memorandum, and I'd like to touch upon them. And I'm not going to speak a long time, but I'd like to talk about some of these particular matters.

My comments are about this case, this matter. There have been, and it's hard to think of the adjective to describe the amount of publicity that there has been around this case, Mr. Kilpatrick, in the recent weeks, but going on for a long period of time, and I think to some extent it is a distraction because in part it seems to attempt to make Mr. Kilpatrick what I think is, in a biblical sense, a scapegoat to send him out with all the sins of the city's last 50 years on his shoulders.

So what I want to do is talk about those things that I think are important considerations pursuant to 3553(a) in the context of this case. The first one of those that -- that we have touched on is his background and characteristics. The government has raised some issue about whether that's even appropriate to consider, but I think that it's -- certainly, in this case, it is exceedingly important to consider the man that he is, that he is now, and that he was at the time that he was married.

His life, looking back through that history, is one

that appears to have led to a goal of seeking elective office. He was raised with his mother, who was a politician elected to be a state representative and then a congresswoman representing a district that included a large part of the City of Detroit, at a young age for Mr. Kilpatrick.

He has obviously also some very natural characteristics that would enhance anybody's ability to be a politician. He's tall, good looking, has an engaging smile and laugh, and easily talks to people in all the ways that politicians find to be successful.

His life plans also were directed toward that, and he went to Cass High School, played football, went off to college in another state where he graduated with honors, where he was on the football team and got All American status, and that, too, led him to the ability to use his intellectual gifts and natural talents to be an elected leader.

When he returned to Detroit after college graduation with the woman that was to be his wife, Carlita, he first started working in the city as a middle school teacher which he has described to me, and I think probably also in a book that he wrote, as the best job that he ever had because it had the opportunity for him to be able to have contact with young people in helping to reform their lives.

He went on to have success in becoming elected to the State House of Representatives after his mother left to

become a congresswoman, and there, was respected as a leader, was respected as somebody who could work with the opposition, and was respected enough so that he was elected to positions of leadership within the democratic party.

The circumstances that have taken place since at least 2008 have now excluded him from being able to use those skills and those talents in an elective office, and I'm sure that you will hear from him in a bit this morning that he hopes that his life can still be a productive and meaningful one.

He began service to the City of Detroit in January of 2002 with a list of priorities, which included very high up, improving the quality of life for the people of the city. It has been his hope and the hope of many of us who live in the City of Detroit that it would become a more vibrant and viable city, and that's what he set out to do, and there were a whole list of accomplishments that did occur that have been largely overlooked in the torrent of reports about the matters relating to this trial and other things.

There has been economic development. High among those projects was the Gateway project in the City of Detroit which included the restructuring, refurbishing, the refinishing of the sewer lines in the city that helped to create better arteries to help provide better access into downtown Detroit, all of which were essential to allow the proper functioning of these two sporting events that took place in Detroit in 2005

and 2006; the All Star game, and then the 40th Super Bowl.

The Gateway project and those sporting events also then led to circumstances which were able to bring people together in the city, to work together, not just from the City of Detroit but from all over southeastern Michigan. There was property tax relief for people in neighborhoods, riverfront development of the riverfront walkway which enhanced the viability of the riverfront as a place to live, to work at, and which there could be economic development, construction of new hotels including the Book Cadillac just a block away.

There was no question that all these things were accomplished, but they are now overshadowed by the events for which we're here today.

After he took office, Mr. Kilpatrick became consumed with the activities that were part of the city. It consumed his days and his evenings, and the city became his life. Much of what he wanted to be and to do was difficult to keep track of in that circumstance. He, as is reported in the presentence report, as the Court knows, as the government has reflected, went through a state case in which he was charged with perjury and assault. He entered pleas, he resigned from office, and he recognizes that those things impacted his ability to lead, it impacted his marital life.

He had hoped at one time that he would be able to use his talents for the good of the community, and now that can

longer happen.  He recognizes and hopes that he can use them in a productive way in the future.

Another element of the Court's consideration is, of course, the offense conduct, and there's been a lot of information presented to the Court.  You sat through the trial and, I'm sure, know the facts a lot better than I do.  There has been some discussion about them this morning, but because these guidelines are so exclusively driven by the extortion conduct in this case, I think it's important to note, as we did in our sentencing memorandum, that the contracts, the particular ones that are involved in the offenses of conviction and the ones which the Court has noted this morning it looks to, particularly in computing the financial advantage or loss amount, these all reflect contracts that were performed through the water department.  There were three others; the Heilmann Recreation Center -- or two others, Heilmann and Book Cadillac, which were not part of water department projects and funding.

All of these were done to completion.  Two of them, including the Book Cadillac, won national awards, and they were completed on time.  So the aspect of this case is not about not getting performance.  It's about the allegations of the extortion which has already been addressed this morning.

So that brings me to talk about the element of deterrence which is, I think, a very important aspect of what the Court must consider.  And I would say, first of all, that

USA v. Kwame Kilpatrick    Case No. 10-CR-20403-01

if the sentence in this case is what we have advocated it should be, and that is not more than 15 years, it's still an enormously long time in anyone's life and in the life of somebody at the age of Mr. Kilpatrick who has a great deal of potential and ability left to use in productive ways.

The punishments that he has received in the state cases that I referred to are also things that serve as deterrence, and as Ms. Raben has indicated, and in considering the impact of those for purposes of criminal history computations, those occurred in 2008.  The indictment in this case came a couple years later.  So the impact of those cases, I think, and the punishments in those cases are still relevant considerations.  One of those is the effect of incarceration, and for Mr. Kilpatrick that's already occurred here, at least on three different occasions.

As I learned as a young prosecutor from people who had gone through this process, it is the clang and the echo of that door on the cell the first time, and the feeling of loneliness, that has the most incredible and indelible impact upon an individual who has not ever been part of that system before.  Now, that's happened to Mr. Kilpatrick when he first was incarcerated in Wayne County Circuit Court proceedings, and a second time after he received a longer sentence after there was a determination of a violation by Judge Groner.

The time that he served on these occasions was not

typical in many respects, although a lot of people have easily said that he is treated differently all the time because he is the mayor of the City of Detroit. In fact, there are occasions when it's obviously clear that the treatment, the disparate treatment, is more severe. His incarceration in the Wayne County Jail was spent alone in a solitary cell, much like the segregation that occurs for a prisoner in the segregated housing units in federal and state prisons. That's where he was housed after he finished the initial ten days to two weeks when he began serving his sentence for his violation in state court of 18 months to 5 years. He spent 6 months in the Oaks facility in the Michigan Department of Corrections in the SHU, 23 hours a day locked down in an individual cell.

I'm not saying these things to ask the Court to feel sorry for him, but to suggest that Mr. Kilpatrick knows the impact and the meaning of incarceration.

When he was transferred from the Michigan Department of Corrections to Milan in anticipation of his appearance in court for arraignment on this indictment, he was initially held again at the SHU at Milan for ten days because of their perceived need that they needed to put him in a separate place.

And then, finally, it's of some significance, I'm not arguing with the Court's rationale in any way at all, but just to note that Mr. Kilpatrick was incarcerated immediately after the return of the jury verdict in March of this year, and

that's a matter within the Court's complete discretion.  It happens sometimes, many times it doesn't happen, but he has been incarcerated again.

The prosecution in this case has, without any question, had an enormous impact, and I'm not saying that here as some kind of a gratuitous compliment to the government.  It's just a cold fact that from, that we all know from the amount of publicity and attention that this case has obtained in the metropolitan area and around the United States, if not the world, that what the government has attempted to do here has gotten notice of other people.  So to a large extent, I think, Your Honor, the effect of this prosecution, and that is part of a consideration, I think, with regard to the element of general deterrence, has been well accomplished by the government.

It is also, as we've noted and I think the government did as well, that the State of Michigan, the state legislature took an unusual step and passed an amendment to the Michigan constitution which prohibits a person with convictions such as Mr. Kilpatrick from holding office again for 20 years, if there ever would have been any doubt that the position -- the position of public office could be attained again.

Based upon -- well, there's one more element, of course, to consider, and that is the financial penalties.  We haven't discussed those in this case yet.  There have been

financial aspects to the penalties in state court, and they also certainly do go to play some role in consideration of deterrence.

I would respectfully suggest to the Court, then, that based upon these factors, that the sentence advocated by the government, even giving them their due for taking a conservative approach to offense conduct or guidelines, goes beyond what's necessary in order to accomplish the remaining purposes that are necessary to be served by a sentence imposed by this Court.

Another important factor to be considered is that of disparity, and we've all, that is, the defense and government, have raised this under 3553(a)(6). The Court is required to look at cases, sentences imposed in other similar cases, and we have brought to the Court's attention certain cases, as has the government. The meaning of those, though, might be a little bit less than objective in attempts to discern what significance they may have, but I think that they do stand for the proposition that when one looks at a, those on a continuum, that other courts, when faced not only with officials who have been found by a jury or a guilty plea to have violated similar laws, courts have imposed sentences that are much lower than what the government recommends here.

In many cases, and I think I've read through every sentencing memorandum in those cases that I've been able to

find online, they all use these extraordinary adjectives to describe and embellish the nature of the offense conduct. There's always something that seems to be of the kind that allows that to occur when comparing what is the case, what the Court can say after a conviction, to what is the basic standard that everybody holds a public official to, but it's the outcome of those cases, I think, that is significant.

The government says, however, that some of the cases that have been cited have to be discounted a bit because there was an amendment to the applicable guideline in 2004. I may not understand it completely, I've gone back to try to look at what the significance of that is, but I think there's been a shuffling around of the enhancements under that guideline, and basically it comes out the same way now it did before; that for an elected high-level public official who is found to be guilty of these kinds of offenses, the scores come out to 20. They did before and they do now. There's not a lot of difference.

The second thing that's important, and I'm sure there's an explanation for it, but it isn't just the government's focus on the sentence alone that's significant. I think it's necessary to look also to where it was that the Court was coming from when it took into account, to the extent that it found it appropriate, the sentence guideline factors.

I attached the judgment to our sentencing memorandum from the case of William Jefferson because I found there the

statement of reasons, and actually I didn't understand that the Sixth Circuit practice is not to attach those to a judgment of record, but that's the way I found it, and I thought that it was meaningful to see that in that case, where the guideline range for Mr. Jefferson was found by the Court to be not much different, essentially the same as that for Mr. Kilpatrick, that the Court imposed a sentence of 13 years.  Similarly, in the case of former Governor Blagojevich, where the initial determination of guidelines was 30 years to life, the Court imposed a sentence of 14 years.  In the case of Mr. Langford, who I believe was a former mayor of Atlanta where his guideline range was 292 to 365, the Court imposed a sentence of 15 years. In the case of Duke Cunningham, the former congressman from California who entered a plea, the negotiated result where his guidelines far exceeded what the government agreed to was the maximum necessary for punishment of 120 months, and they recommended 120.  The Court gave him 100.  The government said in their sentencing memorandum that he might as well have put a for-sale sign out in front of the capitol building.

The government recently yesterday added the case of Mr. Grace, and I don't have his first name down, who was the mayor of a small town in Louisiana, and I tried to track down what that was all about, and found it in the Fifth Circuit. The courts don't file any of the sentencing materials as a matter of public record, so I called his defense attorney and I

found out that, while the government says the bribery amount in that case was only \$20,000 and that drove a sentence of 22 years, that, in fact, much like the analysis the Court went through here this morning for Mr. Kilpatrick, the Court there determined that the loss amount that raised his guideline level 20 was based upon an amount over \$7 million, higher than what the Court here found today for Mr. Kilpatrick.

So I would suggest that, again, the Court weighs the factor of disparity, that there are compelling reasons for a sentence of the kind that we have recommended.

As a final matter, Your Honor, I'd like to talk a little bit about length of sentences in general.  It's something that I think about on occasion because I've been doing this for awhile, and I think back to the time when I first became an Assistant U.S. Attorney in this building and we had parole guidelines and no sentence guidelines, and most people who were convicted of corruption offenses received sentences which mandated their consideration for release by the parole commission at the end of service of one-third of their sentences, so baseball, football score sentences were unheard of at that time.

As Ms. Raben has addressed the Court this morning, the Sentencing Commission came into play in the 1980s as part of this view that longer is more deterrent, and came up with these guideline numbers for loss and drug amounts, without much

empirical basis with some sort of a -- just a generalized view, perhaps it was one that was present in society for that time, that you got to lock people up and that's the best way to achieve a deterrent. I think that we're now at a point in that continuum where people are starting to see, not only because of the enormous cost to, real cost to governments that can't afford them so well anymore, that that doesn't really serve the purpose intended.

On August 12th of this year, Attorney General Eric Holder spoke to the American Bar Association in San Francisco, noted that one of the things we are, his words, coldly efficient at, is our incarceration efforts. He noted also that there has been an increase in the population of federal prisons since 1980 that exceeds the increase in population rate in the United States by three times. It has also been noted by others that the United States has longer sentences on the whole than any other country in the western world.

When I first read the government's sentencing recommendation of 28 years, that number rang a bell for me, and the reason it did related to a comparison of what's going on in the United States to other countries.

This summer, I had the opportunity to go to a conference of attorneys who practice law and primarily represent defendants at criminal courts before the Hague. One of the speakers at this conference was an attorney, a barrister

USA v. Kwame Kilpatrick    Case No. 10-CR-20403-01

from Victoria, British Columbia, who was one of the prosecutors, a team of prosecutors, including someone from the U.S., in one of the trials as part of the Yugoslav tribunal in which the defendants -- there were three, Kunarac, Kovac and Vukovic -- were charged with crimes against humanity.

They were part of the military unit that controlled a small city in Bosnia called Foca, and they were -- it was the first time in the history of the criminal court at the Hague that the crimes against humanity law was used to prosecute individuals for rape, particularly. They were charged with torture as well. The crimes went on unmitigated for over six months. It was horrendous. And that's what the former prosecutor described at the conference, and he sat down.

And I raised my hand and I asked, "Well, what was the outcome? All of this is well and good, but what was the sentence?" And he said, "28 years for Mr. Kunarac, 20 for Mr. Kovac, and 12 for Mr. Vukovic," and he added that the length of time that they'll serve in prisons depends upon the release systems of the countries to which they were assigned to serve their sentences.

All right. It is our view and our strong plea to this Court, at this time, that this Court impose a sentence that is sufficient but not greater than necessary to accomplish the purposes that you deemed to be appropriate based upon all the things that you have heard in this case and in the exercise

of your discretion.  It's our view that a sentence of not more than 15 years can accomplish that purpose.

The last thing I'd like to say is that it is Mr. Kilpatrick's request that he be, that the Court recommend that he be designated to a federal institution in the state of Texas close to Dallas.

**THE COURT:**  Thank you, Mr. Gurewitz.

**MR. GUREWITZ:**  Thank you.

**THE COURT:**  Mr. Chutkow.

(11:52 a.m.)

**MR. CHUTKOW:**  Thank you, Your Honor.  This is one of the most significant cases of public corruption in recent memory, and not just in this city or this state but in the entire country, and it was committed in one of the most vulnerable cities in this nation.  The punishment in this case should match the scale of the crimes and the profound impact of those crimes on the people of this city.

I want to address quickly some of the cases that Mr. Gurewitz has mentioned in his allocution; specifically, since we were talking about cases around the country, specifically, William Jefferson, a former congressman who was convicted of writing letters on behalf of clients, in essence, moonlighting, using his stationery.  He was not convicted of extortion of a bid rigging scheme.

He also mentions Governor Rod Blagojevich, a former

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

governor of Illinois who was sentenced to 14 years.  If you look closely at the sentencing materials in that case, Mr. Blagojevich only accomplished one of his crimes.  He received $25,000 in campaign contributions, not cash.

If you were to go through the government's sentencing memoranda and itemize all of the unjust enrichment that Mr. Kilpatrick received during his time in office, the fraud of the Civic Fund, of the State Art Grant, Emma Bell, Karl Kado, it comes up to $1.5 million, and that's just from the testimony of people, that is not the entire unjust enrichment.

It's important to note in this case that the crimes that Mr. Kilpatrick has been convicted of were not isolated episodes or caused by a momentary lapse of judgment. Mr. Kilpatrick systematically exploited his public office for over six years as the mayor of the City of Detroit, and before that as a state legislator in Lansing.

Now, we haven't heard from Mr. Kilpatrick, but so far, even now there has been no acceptance of any responsibility for what transpired in this city.  There's been no contrition, there's been no remorse.  This is not a case about his perceived antagonists, his detractors or the media. It's about him, about the staggering crimes that he committed and that he set into motion, about all the people in this city that he let down and that he exploited.

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

He's not the victim but the cause of the painful circumstances that he now faces. A substantial sentence is called for in this case, not only to punish these extraordinary crimes but to deter other public officials who may be tempted, like Mr. Kilpatrick, to enrich themselves at the expense of the public.

Thank you.

**THE COURT:** Thank you, Mr. Chutkow.

Mr. Gurewitz.

(11:55 a.m.)

**MR. GUREWITZ:** I don't have any additional remarks, Your Honor. Thank you.

**THE COURT:** All right. Thank you.

Mr. Kilpatrick.

**THE DEFENDANT:** First, thank you, Your Honor, for giving me an opportunity to speak. I appreciate that. I've thought a lot about what to say today, or if I should say anything at all. I wrote down some notes as I was sitting there because I don't want to mess up, but I do want to say a few things to you and a few things to this community.

One, I respect you, I respect the job that you have to do. I respect the diligence in which you engaged this process. And I know you have to render a sentence today, and I respect that. I just humbly and respectfully ask for a fair sentence based on what happened here.

I respect the jury's verdict.  I think Your Honor knows that I disagree with it in terms of the specific things that I was found guilty on, but I respect the verdict, and I also respect the American justice system.  I still believe it's the best in the world, and I know where I find myself today.

I -- let me -- first of all, I think that these prosecutors are excellent.  I do.  I think that Mr. Chutkow is an amazing lawyer, and I don't say that to be facetious or to be sarcastic.  I think he is really good.  I actually told him that during the trial, and I think he made some incredible points during the trial, and I think he made some good points here today that I agree with.

And although I have these things written down, and usually I can do this, I am basically speaking from my spirit today.  I don't feel that there's anything that I can actually say that will change anything but me, and hopefully change, if the people of the city can hear me -- change what I believe is a collective consciousness of yesterday into a collective consciousness of tomorrow.  I think that we've been stuck in this town for a very long time dealing with me, and I'm ready to go so the city can move on.

The people here are suffering, they're hurting, and a great deal of that hurt I accept full responsibility for. I've apologized to everybody who will listen, but it never seems to get heard.  So the people of this city, I do want to

put in some perspective because to say a blanket accepting responsibility, I think it may be casually or easily looked over as something I just said for today.  So I do want to talk about that a little bit.

I was reading a book, sitting in my cell the other night when I was deciding that I wouldn't say anything, but I felt I owed my children and my wife and the people of this city a little more than that.  So I was reading this book, and it talked about a concept, one that you see what you believe, seeing is believing, and it was talking about a concept of perceptual vigilance, which is believe in what you see, that all of us pretty much see what we believe already; that we -- what we see comes out of our perceptions, our experiences.  And I thought about that, and I wanted to speak to Detroiters about that a little bit.

All I ever wanted to do in my life was be mayor.  I didn't want to be president, I didn't want to be governor.  I went to law school, but I didn't want to be a lawyer.  I wanted to be mayor of the City of Detroit.  It's all I ever wanted to do.

When I won this job, and after spending a couple of months into the job, six months, I hated it.  I absolutely hated it.  It was the hardest thing I ever had to do.  But particularly in the black community, in the African American community, men don't cry, they don't bow down.  You go outside

every day and you look confident. That confidence, or that false confidence, was deemed to be arrogance. Nobody, nobody, not any of these people, not any lawyer that's ever been to see me, not any friend that's ever spent any time with me has ever left an engagement thinking I was arrogant, but everybody who watched me on television, who watched me walk down the street, including myself, Your Honor, I sit in the prison room and look at the television, like, "What are you doing, man?" I see walking down the street. But that was false confidence.

The pressure of this job, and I've watched it eat up and spit out men after me, the pressure of this job is enormous, managing the emotions, managing the tension, managing the city with no money is hard every single day, and then trying to get people to believe and hope and have faith that something is about to happen and something is about to change is hard. It's the hardest thing that you can imagine.

So when Mr. Gurewitz -- and I didn't know what Mr. Gurewitz was going to say today -- when he said that I got consumed by it, it was this pride, yes, and ego that took over that I couldn't lose. It's all I knew. I saw, I believed that the city could be great, and so what I tried to do was wear that on my shoulders and on my sleeves, and it communicated from my spirit as ego and pride, and I believe, because I represented the people of this city, that I really, really, really messed up with that.

I didn't have a peer, Your Honor, I didn't have anybody to talk to and say, "Hey, this is what you should be doing."  I worked my butt off, and I can't stand here and say that I didn't.  I worked my butt off for this town, I did, every single day.

I accept responsibility because in 2008, and I'll go back to -- I don't want to talk about specifics of this case, but I lied.  After being called corrupt, thief, thug, murderer, criminal, every single day or week for seven, eight years, in 2008 I lied about an affair because I was living a lie.  That's the lie I was living, Your Honor, and in that moment I didn't accept responsibility for it.  I was mad at people for finding out.

So after some time and some counseling and some conversations with people who knew more than I did, I left the City of Detroit.  I had extensive counseling, my wife and I had counseling, and I left.  I apologized, and I left, and I thought it was the right thing to do.  And I didn't realize at that moment, like I do now and I have for the last couple of years, that I significantly beat down the spirit, the energy, and the vibrance of what was going on in Detroit at the time.  Individual people lost faith -- I thought it was private, it wasn't private.

As the leader of this city, people lost faith in the leadership, people lost faith and trust in the leadership, and

also, once you lie about an affair, and once you are a liar, an adulterer, everything else that comes out of your mouth after that is perceived the same way.

And when I left here, I had the most amazing opportunities in my life. For the first time in my life, I was happy, since college, the first time. The first time I enjoyed waking up and being with my wife and my children, the first time we were communicating with one another, the first time I had a life. And the largest economic downfall ever in the history of the country outside of the depression was hitting my city, and I was in Texas enjoying my life, and everybody here was going through pure hell, the companies and everything. And I should have did something, I should have said something, I should have came back, I should have did -- I don't -- I beat myself up about this all the time, and I don't know what I was supposed to do, but I apologize to the citizens of the city for abandoning you, for leaving, and to leave you like I did. I do.

As far as this case, Your Honor, I want to say something about my co-defendants, and I don't know if I should or shouldn't, but it's on my heart to say it.

First, my dad. My father is a good man, he's a real good man. Talk a lot of stuff, but he's not a criminal. My father and mother divorced when I was ten years old. My father picked me up from school, fifth grade, and he told me, "I'm

going to be here for the rest of your life," and he did. Every school, every game, everything. He taught me how to be a man. I had a great grandfather, a great father, and I'm a great dad because of him, even with all of the nonsense that I put them through. I was the greatest dad in 2008 to March 11, and it's because of him.

Since March 11, he's done everything he can to be in my sons' life because seven or eight out of ten black boys growing up now do not have a father, don't have a relationship with their father, and there are three more that won't now, and so I wanted to make sure that they have somebody. I didn't even have to -- my dad stepped in. And so I'm just saying he's a good man. He was charged in a RICO indictment with me, and he had absolutely nothing to do with anything in the city.

My other co-defendant, Bobby Ferguson, a conversation about Bobby, I met Bobby Ferguson for the first time in my life December of 1996. We weren't childhood friends, we didn't grow up together. Bobby Ferguson, I met him at a function for my mom. She was -- had just won a congressional seat, and she was being sent off to congress and had an event, Your Honor, and I met him in a passing way. His company was right in the middle of my district. I was already elected to the State House, and I met with him for the first time, as a formal meeting, in 1997. In 1997, I went over to his office, and I met him, and he was in there working on the

Comerica Park bid, and he was ordering people around, and hollering, and moving, and working on that bid, and I just respected what he did.

We didn't become close until after 1998.  Bobby was carjacked and shot several times.  I don't know if Your Honor knows.  The next day, I received a call that he got shot, and I went by the hospital.  At that time, they said he wouldn't make it.  And when I got there, his wife and kids were surrounding him.  That's the first time I had met all of them, in 1998, and he opened his eyes and he thanked me for coming, and I left. Three days later, when I went back to the hospital to check on him, he was in there working on the Ford Field bid.  I thought that was the craziest thing ever, I said, "This dude is nuts." But I've never seen a person more driven than him, ever.

I was watching a special, and I'll just be brief after this.  I was watching a special, and in prison, they talked about the greatest jobs in Detroit, and they were talking about the greatest things that happened in Detroit, something on one of the stations that I hear, and they said the Ilitches moving to downtown Detroit, and which happened on the Mayor Young administration, and they went through the two stadiums and Compuware.  Bobby Ferguson was one of the first people out there digging a hole at Comerica Park, he was the first person on site at Ford Field, and he did all the site clearing, underground utilities for Compuware.

One time, I saw Bobby Ferguson, he -- we did a bus tour around the state, and I'm very proud of my service in the House of Representatives, we did a bus tour around the state where the House democratic caucus was going around the state, and we needed an RV, and Bobby allowed us to use his RV to go around the state.  And I wanted to go thank him, and he said he was on Eight Mile, and this was 2000.  I went over there, and he was in a hole, digging some holes and putting pipes in, or something, and that was in 2000.  Bobby Ferguson had a very lucrative business before I became mayor.  He was making $20 million a year before I was mayor, and I was just proud of him.

And it was never about Bobby Ferguson or me, it was more about raising the participation of those types of businesses that sit in these neighborhoods in the City of Detroit.  Now, I know that that's not taken well in this room, but I don't know if I could be me without saying that, and it's not in arrogance or in anything against this Court, but that's what got us together.

Now, would I do something different?  Absolutely.  I would never, ever have the type of conversations that we were having, which blurred the minds of propriety.  Ever.  I would never be allowed to be used to, you know, be the person who was strong arming somebody.  I don't know if I heard that there, but I think Your Honor did.  And I would never put any

contractor, or any person that's a friend, before anybody else in the -- of the people of the City of Detroit, and I think that the verdict in this case said that that's what happened, and so there has to be something I needed to do much different than I did.

I'll, lastly, just say that when -- well, not lastly. The special also talked about, Your Honor, the next jobs that were great for the city, and I'm trying to do it from memory, is the three casinos, and Eastern Market, and the riverfront and Dan Gilbert, and I was looking at all of that, and none of the things that they named after that did Bobby Ferguson do any work on.

And the prosecutors did a great job titling this as "there was no deal without Ferguson," and that's just not true, and I don't -- it's not that I'm not accepting responsibility for any of it. Mr. Chutkow, who like I said before is an incredible lawyer, he talked about stealing or taking from the citizens of the City of Detroit. Wow. I've never done that, Your Honor.

Lastly, I know that the city is going through a tremendous bankruptcy right now. I know that, listening to the jurors, a lot of them wanted closure for the city. I know that Your Honor also wants closure, as well, and I wanted to let Your Honor know that I do, too. I want the city to be able to fully participate and focus on things other than me. I did

things.  It's over.  I'm done.  And I want the city to turn the page.

So I know that Your Honor has a job to do, and I know that Your Honor saw everything that happened here at trial, but I don't believe that, aside from what Your Honor has to do with sentencing, we want something that is very dissimilar from one another.  I want the city to heal.  I want the city to prosper.  I want the city to be great again.  I want the city to have the same feeling it had in 2006 when the Super Bowl was here, when everybody felt like they could participate; white, black, Latino, Asian, suburban, city, where everybody felt like this was their town.  And I've been a tremendous problem in getting that to happen since that point.

And so for all the people who have felt that I let them down tremendously, to all the people whose faith and hope that I destroyed, to all those people living in communities under siege, I say with every morsal of my being that I'm sorry to you.  And with everything else that I have, if anything, I'll say the same to my wife, to my children, and specifically to my mom and my dad.

My mom, who was an incredible public servant, she lost her job because of her son.  Her son that she raised and fed and taught and made do his homework killed her career.

And my family is not here today, Your Honor, because other than being subjected to whatever is happening here today

and what's happening here now, I didn't want them to have further damage leaving this courtroom. As Your Honor could probably figure, it would be hell for them to have to go through whatever happens outside next. But they all have sent me their love and their prayers, and they all have forgiven me. I just only hope that one day I can forgive myself.

Mr. Chutkow said something that's very, very interesting. When we talk about -- not Mr. Chutkow, I'm sorry, Mr. Gurewitz -- about all the different times in incarceration that I've been through, they all taught me something different.

I was on parole, or probation, for 33 months. Seven of those months were in Detroit, and basically, that was during the trial. I had more problems in the seven months than I did in the whole other 26.

And I remember one time I was walking out this courtroom, and the media, who I think that this was a good thing that they did, it was a young man who was in prison with me, he, he was outside. I don't know, he was just outside, and I walked out of the courtroom one day, and the media said, hey, here's a -- or he came up and I greeted him, and we talked and we parted ways, and I actually thought it was a good thing to see somebody who had done all the time that he did, and see somebody from prison.

That next weekend was my son's birthday. That was the weekend of December 9th, my son's birthday was the next

weekend.  The day that that story aired, I went home and I got a call from my parole officer that I was being violated for having contact with a known felon, and although I planned this party for my son, and I have to say this because I continue to break promises.  I promised him I'd be there, I promised I'd do something special for his birthday.  I was prevented from going home to see my son because of that engagement on television with, quote, a known felon.

I don't want to say this to -- and I don't know how it will come off, Your Honor.  I'm not saying it for any sympathy or anything else, I'm simply saying that it's been real hard, real tough to manage what's real or true versus what people think and see, and for those people in this court, Your Honor, this is just to you, I'm praying and I'm hoping and I'm pleading with this Court that it will be about what happened here, and I'm sure that Your Honor is going to do that.

And I don't know, I guess I'm done.  I know I'm going to be upset for not saying the right stuff.  I know I'm going to be -- you know, I'm usually a good speaker, but this is not me.  I've never been here before, I never want to be here again, and I just want people to know that I'm incredibly remorseful for the condition of this city, and any role or any part that I played in it, I'm profoundly sorry for.

Thank you for the opportunity, Your Honor.

**THE COURT:**  Thank you, Mr. Kilpatrick.  Let's take

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

Case 2:10-cr-20403-SJM-MKM  ECF No. 492, PageID.16220  Filed 10/29/13  Page 69 of 88  69
Sentencing of the Court
Thursday, October 10, 2013

about a 15-minute break, and then I'll come back and announced sentence.

**THE COURT:**

**THE CLERK:** All rise, court is now in recess until 12:45.

(Recess taken 12:23 until 12:45 p.m.)

**THE CLERK:** All rise.  Court is now reconvened and you may be seated.

**THE COURT:** I want to begin this part of the proceeding by going through what the guideline provisions are and explaining to those of you who are not necessarily lawyers or involved in the criminal justice system how the guidelines work in a case like this.

As I've said earlier, I agree that the guidelines set forth in the Presentence Investigation Report are accurate and correct.  That scores Mr. Kilpatrick at a Level 43, Criminal History Category IV, and under the guideline chart which appears at the back of my guideline manual, guidelines manual, that says life in prison.

As I indicated when Ms. Raben was at the podium, for purposes of my scoring of the guidelines, I discounted the contracts for which Mr. Kilpatrick was not separately convicted, and that takes the guidelines down actually only one level, to a 42, Criminal History Category IV.  The reason it's one level and not two is because the original scoring took him

to 44, but the top guideline level permitted is 43.  So that's why it was scored at 43.  The discounting of those other contracts takes it down to a 42, but that does change the analysis.  Now, instead of just straight life, it says 360 to life.

I will also explain to you that, or mention that if I accept Ms. Raben's argument that the criminal history category is overstated here and that Mr. Kilpatrick should be scored as a III rather than a IV, it does not change the guideline level here, it's still 360 to life, and that would be true even if we dipped fairly down into the sentencing guidelines level.  360 to life starts at quite a low level and certainly covers the Level 42, Criminal History Category IV.

Now, the guidelines in this case, and actually in all cases where there are many counts of conviction, are scored -- you don't count every count of conviction when figuring the guidelines.  The counts are grouped by category, and in this case the entire guidelines, the entire guideline calculation is driven by the extortion counts.  And that's part of what Ms. Raben and Mr. Gurewitz were arguing, that the driving of the guidelines by the extortion and fraud tables kind of pushes them way, way up into a stratospheric level, and in fact it does bring them significantly up because the fraud guidelines enhance the calculation by 18 levels, and that's how come we get up to such a high level.

Sentencing of the Court
Thursday, October 10, 2013

But there's a statutory cap on all of the extortion counts and on the RICO conspiracy count. That cap is 20 years. So when we had that little discussion about what the probation department was saying the guidelines were, what the probation department was really calculating was if you took the statutory cap on every single count of conviction and added them all together you'd come up with that 368 years. But that's not what the guidelines are. That's simply if you took the statutory cap on 24 counts and added them all together.

But, as I said, the guidelines, because the fraud numbers are so high, don't even take into consideration the fact that there are two other categories of crimes from which Mr. Kilpatrick was convicted: The mail and wire fraud crimes, and the tax crimes. And I just want to state for the record that if those crimes were separately scored the guidelines would require 57 to 71 months on the mail and wire fraud counts and 33 to 41 months on the tax charges. So that would be, if you added those together, 90 to 112 additional months based on those additional counts of conviction.

The guidelines aren't scored that way because the extortion guidelines are so high, and I know I'm being a little confusing about this, but at least I want to state it for the record so that you'll understand where these numbers, some of these numbers come from.

So the guidelines, as I said, are correctly scored

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

Case 2:10-cr-20403-SJM-MKM ECF No. 492, PageID.16223 Filed 10/29/13 Page 72 of 88   72
Sentencing of the Court
Thursday, October 10, 2013

at Level 43, Criminal History Category IV, making a life sentence the correct guideline calculation. The Court has indicated that -- I've scored them at 360 to life rather than at the life sentence scored by Probation.

Now, guidelines are advisory, they're not mandatory, and the Court is directed under 18 United States Code Section 3553 to impose a sentence that is sufficient but not greater than necessary to meet the statutory objectives, and in doing so, the Court is directed, first, to look at the nature and circumstances of the offense and the history and characteristics of the defendant.

Before I get to the specific statutory factors, I want to say that, in considering whether a sentence is sufficient, it is important to me, I think, to take into account that it was not just the extortion counts for which Mr. Kilpatrick was convicted, that it's important to look at the fact that there were other counts of conviction as well; the mail and wire fraud, and the tax charges.

So with respect to the nature and circumstances of the offense, I think everyone here understands that Mr. Kilpatrick was convicted of running a criminal enterprise using the office of the Mayor of the City of Detroit. The history and circumstances of the offenses for which he was convicted extended over the entire six years that he served as mayor, and had their start during the time he served in the

Case 2:10-cr-20403-SJM-MKM ECF No. 492, PageID.16224 Filed 10/29/13 Page 73 of 88 73
Sentencing of the Court
Thursday, October 10, 2013

State legislature. Evidence from his bank records introduced at trial showed that more than $840,000 in unexplained expenditures above and beyond his salary as mayor passed through his bank accounts, and this is even without regard to any cash bribes and kickbacks he might have received that did not pass through his banks.

His relationship with his friend Bobby Ferguson, his co-defendant who was also convicted of the racketeering conspiracy charged in Count 1 of the indictment, was at the heart of the most profitable criminal activity. The indictment charged, and the jury found, that Kilpatrick used the power of his office to assure that Ferguson was included in work on lucrative city contracts, primarily involving the Detroit Water and Sewerage Department, and that Kilpatrick shared in the profits realized by Ferguson from those contracts. The testimony of many witnesses, bolstered by Kilpatrick and Ferguson's own text messages, confirmed the pressure exerted by the defendants on contractors who wanted to do work for the City of Detroit. This course of conduct made work more costly for the city, which certainly could not afford it, and pushed a number of contractors out of business.

Kilpatrick's corrupt activity appears to have started during his time in the State legislature. Evidence was submitted at trial to show his misuse of State grant money for expenditures which benefited Kilpatrick's wife, Carlita, or his

Case 2:10-cr-20403-SJM-MKM  ECF No. 492, PageID.16225  Filed 10/29/13  Page 74 of 88  74
Sentencing of the Court
Thursday, October 10, 2013

friend, Bobby Ferguson, rather than the intended beneficiaries.

Once in office as Mayor of Detroit, Kilpatrick continued the misappropriation of funds from supposedly nonprofit organizations, the most important of which was the Kilpatrick Civic Fund.  Evidence was presented to show, and the jury found, that Kilpatrick used Civic Fund funds for get-away weekends with his chief of staff, spa treatments, yoga sessions, golf clubs and lessons, anti-bugging equipment, private school and summer camp for his children, and other personal expenses.  This was despite Kilpatrick having solicited donations to the fund by saying that he would use the money to improve Detroit neighborhoods and the lives of city youth.  His misuse of the Kilpatrick Civic Fund was the basis of his convictions on Counts 18 through 26, 28 and 30.

While he was Mayor, Kilpatrick also took bribes from local vendors who wanted city business, including Karl Kado, Jon Rutherford, Chauncey Mayfield, Johnson Akinwusi, and others.  This activity was charged as part of the Count 1 racketeering conspiracy for which the jury convicted both Kilpatrick and Ferguson.  Kilpatrick also directed city vendors to pay his father, Bernard Kilpatrick, in order to receive favorable treatment on city contracts and pension deals.

As I mentioned earlier, Kilpatrick used the power of his position as mayor and his appointment as Special Administrator of the Detroit Water and Sewerage Department to

Case 2:10-cr-20403-SJM-MKM  ECF No. 492, PageID.16226  Filed 10/29/13  Page 75 of 88  75
Sentencing of the Court
Thursday, October 10, 2013

steer an astounding amount of business to Ferguson.  Testimony from city contractors, including Mr. Rachmale, Mr. Hardiman, Tony Soave, Kathleen McCann, Bernard Parker, III, and others, along with testimony of those within the city administration, including Derrick Miller, Kim Harris, Darrell Latimer, and others, all attested to the pattern of threats and pressure exerted by Kilpatrick and Ferguson to make sure that Ferguson was making a handsome profit from city contracts.

Kilpatrick and Ferguson have suggested during some of the cross-examination of witnesses that they were merely trying to protect and enhance the participation of minority business owners in city work, but in fact the evidence established that their activities forced a number of minority contractors out of work and excluded others from business to which they would have rightfully been entitled.  All of this was alleged in Count 1 of the indictment and the related substantive Counts 2, 3, 4, 5 and 9, in all of which the jury convicted Mr. Kilpatrick.

With respect to the history and characteristics of the defendant, Mr. Kilpatrick was a larger-than-life character who lived the high life during the time he was mayor.  He hosted lavish parties at which attendees were expected to make significant cash gifts, demanded cash tributes from people who worked in his office, and loaded the city payroll with family and friends.  He had an affair with his chief of staff, lied

about it in court, tried to cover it up, and ended up pleading guilty to two felony counts of obstruction of justice.  He then lied about his financial resources in order to avoid his restitution obligation to the city.

Although he expressed contrition here in his allocution this morning, he has generally shown little remorse with respect to any of the activity for which he was indicted, tried and found guilty, maintaining for the most part that this entire course of events is nothing more than a media witch hunt.

Mr. Kilpatrick urges the Court to consider, and Mr. Gurewitz urged the Court to consider, that he was responsible for many positive accomplishments of Mayor and, indeed, he was.  That is what he was elected to do.  One sad thing about this case is that a man with the charisma and ability of Mr. Kilpatrick chose to waste his talents on personal aggrandizement and enrichment when he had the potential to do so much for the city.

The next factor directed by the statute is to consider the seriousness of the crime, the need for just punishment and the need to establish respect for the law.  This is the sentencing factor that the guidelines attempt to address, and I have already analyzed what I believe to be the correct guideline calculation, but in addition to the guidelines issue, it is worth noting in this factor that the

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

Case 2:10-cr-20403-SJM-MKM   ECF No. 492, PageID.16228   Filed 10/29/13   Page 77 of 88   77
Sentencing of the Court
Thursday, October 10, 2013

seriousness of Mr. Kilpatrick's crimes is compounded by the involvement of so many officials in his administration.  As the government has noted, at least 18 city officials and 16 private parties who did business with the city were convicted of corruption offenses during Mr. Kilpatrick's tenure as mayor.

It is difficult to quantify the total cost of the devastating corruption instigated by Kilpatrick and others who acted with him.  In addition to the tens of millions of dollars extorted -- of extorted city revenues which flowed into the bank accounts of Ferguson and others, the tens of millions of dollars in losses from corrupt pension deals and the bribes Kilpatrick took from various city vendors, there is the harder-to-quantify costs of the corrosive pay-to-play system Kilpatrick set into motion.  No one can assess the number of qualified, hard-working, ethical contractors and vendors who simply sat on the sidelines or went elsewhere rather than compromise themselves by working in a corrupt municipal environment.  But one thing is certain.  It was the citizens of Detroit who suffered when they handed over their hard-earned tax dollars to the city but failed to receive the best services at the best price in return.

There has been some media commentary that suggests that Kilpatrick is responsible in some way for pushing Detroit closer into bankruptcy, and I want to make clear that I am not making any such statement.  Larger social and economic forces

Case 2:10-cr-20403-SJM-MKM  ECF No. 492, PageID.16229  Filed 10/29/13  Page 78 of 88  78
Sentencing of the Court
Thursday, October 10, 2013

have been at work for decades in Detroit and Mr. Kilpatrick cannot be held accountable for them, but corruption has its own costs, including the reduction of the productivity of public expenditures, the distortion of the allocation of resources, and the diversion of investors, suppliers, and service providers.  Moreover, Mr. Kilpatrick's abuse of the public trust was a corrosive factor in itself, eroding confidence in city government and breeding cynicism and apathy among those who might otherwise be advocates for city growth.

The next factor in the sentencing statute concerns deterring the criminal conduct of others.  Sentences for public corruption cases have been increasing over the last few years with the hope that significant sentences will deter similar conduct in elected officials.  One can only hope that this may be so.  At the very least, a significant sentence in this case will send the message that this type of conduct will not be tolerated.  Hopefully this will begin to foster a more positive attitude about the transparency and accountability of city government so that more good people will be inclined to participate.

The next factor is protecting the public from further crimes of the defendant.  Mr. Kilpatrick's track record over the last couple of years do not inspire confidence in his ability to reform his behavior, but his remarks this morning certainly show more awareness than I had seen along the way,

Case 2:10-cr-20403-SJM-MKM  ECF No. 492, PageID.16230  Filed 10/29/13  Page 79 of 88  79
Sentencing of the Court
Thursday, October 10, 2013

and Mr. Gurewitz' comments that Mr. Kilpatrick hopes to be able to lead a productive life from this point forward, and I hope he will.

He has previously shown little respect for the law and his responsibilities at any point along the way. I do believe a long prison sentence is necessary to insulate the public from his behavior, and even at the lower end of what the defendant has requested, it's going to be a long sentence.

I want to say one more thing about kind of the overarching issue in this case, and that's this: "In a democracy, the principle of accountability holds that government officials, whether elected or appointed by those who have been elected, are responsible to the citizenry for their decisions and actions. Transparency requires that the decisions and actions of those in government are open to public scrutiny and that the public has a right to access such information. Both concepts are central to the very idea of democratic governance. Without accountability and transparency, democracy is impossible. In their absence, elections and the notion of the will of the people have no meaning, and government has the potential to become arbitrary and self-serving."

I believe that's what happened in this case. We lost transparency, we lost accountability. So much of the city business was done behind closed doors with no one really

Case 2:10-cr-20403-SJM-MKM  ECF No. 492, PageID.16231  Filed 10/29/13  Page 80 of 88  80
Sentencing of the Court
Thursday, October 10, 2013

looking into it until the press got ahold of this a few years ago and began to open the door to what was transpiring in city hall.

I hope that the sentence that I'm about to impose on Mr. Kilpatrick will give that message; that we're demanding transparency and accountability in our government; that we expect it; that if there has been corruption in the past, there will be corruption no more.  That way of business is over.  We're done.  We're moving forward.

I hope, as we all in this room hope, that the bankruptcy that the city is going through will set us on a firmer economic basis to move forward, and I hope that any future political administrations will recognize the importance of accountability, transparency and responsibility to the public.

Now, the last factor that the Court is directed to consider is the need to avoid unwarranted sentence disparities among persons who have committed similar crimes.  It's kind of a hard question in this case because the breadth, the scope of the activity in this case extended for so long, involved so much money, involved so many people, and ran so deep.

In recent years, public corruption sentences have run from 14 years, I guess, on the low side, maybe there were a couple that were maybe even a little lower than that, to 28 years on the high side for a sentence meted out against a

Case 2:10-cr-20403-SJM-MKM  ECF No. 492, PageID.16232  Filed 10/29/13  Page 81 of 88  81
Sentencing of the Court
Thursday, October 10, 2013

county commissioner in Ohio in federal court about two years ago.  In my mind -- the government has asked for a sentence of at least 28 years, and I believe that that is in fact where this sentence should be.

So on Counts 1 through 5 and 9 of the Fourth Superseding Indictment, pursuant to the Sentencing Reform Act of 1984, the Court, considering the sentencing guidelines and factors contained in 18 U.S.C. Section 3553(a), hereby commits the defendant, Kwame Kilpatrick, to the custody of the United States Bureau of Prisons for a term of 240 months on each count, to run concurrently.

On Count 17 of the Fourth Superseding Indictment, pursuant to the Sentencing Reform Act of 1984, the Court, considering the sentencing guidelines and factors contained in 18 U.S.C. Section 3553(a), hereby commits the defendant, Kwame Kilpatrick, to the custody of the United States Bureau of Prisons for a term of 120 months, to run concurrent to the earlier counts.

On Counts 18 through 26, 28 and 30, pursuant to the Sentencing Reform Act of 1984, the Court, considering the sentencing guidelines and factors contained in 18 U.S.C. Section 3553(a), hereby commits the defendant, Kwame Kilpatrick, to the custody of the United States Bureau of Prisons for a term of 84 months on each count, concurrent to one another, and consecutive to all other counts.

On Counts 31 through 36 of the Fourth Superseding Indictment, pursuant to the Sentencing Reform Act of 1984, the Court, considering the sentencing guidelines and factors contained in 18 U.S.C. Section 3553(a), hereby commits the defendant, Kwame Kilpatrick, to the custody of the United States Bureau of Prisons for a term of 12 months on each count, to run concurrent to one another and consecutive with all other counts.

The total, then, is 28 years.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years on Counts 1 through 5 and 9, 17, 18 through 26, 20 and -- 28 and 30, all to run concurrently, and one year on Counts 31 through 36, also concurrent to the earlier counts.

It is further ordered that the defendant pay a special assessment of $100 on each count for a total of $2,400, which is due immediately.  The Court waives the imposition of a fine, the costs of incarceration and the costs of supervision due to the defendant's lack of financial resources.

While in custody, the defendant shall participate in the Inmate Financial Responsibility Program.  The Court is aware of the requirements of the IFRP, approves the payment schedule of this program, and hereby orders the defendant's compliance.

The Court will impose restitution in a total amount

Case 2:10-cr-20403-SJM-MKM  ECF No. 492, PageID.16234  Filed 10/29/13  Page 83 of 88  83
Sentencing of the Court
Thursday, October 10, 2013

to be determined.  Interest shall not accrue.  We'll have a separate hearing on restitution sometime within the required 90 days.

The mandatory drug testing condition is suspended based on the Court's determination that the defendant poses a low risk of future substance abuse.

With respect to supervised release, defendant shall abide by the standard conditions adopted by this court, and shall comply with the following special conditions:

The defendant is to make arrangements with the IRS regarding a monthly payment plan regarding the payment of back taxes, plus any penalties or interest that may accrue. Defendant is to provide the payment arrangement schedule with the IRS to his probation officer.

Defendant is to fully cooperate with the IRS by filing all delinquent or amended returns within six months of the sentence date, and to timely file all future returns that come due during the term of probation or supervised release. Defendant is to properly report all correct taxable income and claim only allowable expenses on those returns.  Defendant is to provide all appropriate documentation in support of said returns.  Upon request, defendant is to furnish the IRS with information pertaining to all assets and liabilities, and the defendant is to fully cooperate by paying all taxes, interest, and penalties due, and otherwise comply with the tax laws of

the United States.

Defendant shall provide the probation officer access to any requested financial information.

Defendant shall not incur any new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the payment schedule.

Defendant shall make monthly installment payments on any remaining balance of the restitution at a rate and schedule recommended by the probation department and approved by the Court.

Mr. Kilpatrick, you have the right to appeal your convictions and your sentence. A notice of appeal must be filed within ten days. Thank you all.

I think we still have the forfeiture to deal with.

**MS. AOUATE:** Yes, Your Honor.

**THE COURT:** I didn't see any objections to the forfeiture. Are all of the papers in order?

**MS. AOUATE:** Your Honor, on Monday, I submitted to the Court a Preliminary Order of Forfeiture that there was no objection to previously. However, on Tuesday, opposing counsel said that they would like the amount to be -- the determination of the amount to be postponed to another date.

The Preliminary Order of Forfeiture that I did submit to the Court is a general preliminary order of

Sentencing Hearing
Thursday, October 10, 2013

forfeiture which states that the amount will be determined at the time of the sentencing.  If the Court is prepared to enter the amount of the money judgment, I can submit an Amended Preliminary Order of Forfeiture.  However, under the law, a Preliminary Order of Forfeiture must be entered at or before the time of sentencing.  Forfeiture must be put on the record at the time of sentencing and included in the judgment.

THE COURT:  With an amount?

MS. AOUATE:  The amount could be determined at a later date upon amendment, but those three things must be done.

THE COURT:  But does an amount have to be put in today?

MS. AOUATE:  Not today, Your Honor.  The generic or general Preliminary Order of Forfeiture has been submitted via ECF utilities.  The only two words that would need to be omitted from that in order for it to be effective for a determination for an amount later would be the two words "at sentencing" on Page 2.  If the Court wants to have its case manager adjust it, there's only two words that would have to be omitted from the proposed Preliminary Order of Forfeiture in order for the Court to enter that today.

THE COURT:  All right.  We'll enter the Preliminary Order of Forfeiture today and determine the amount at the time that we determine the restitution obligation.

MS. AOUATE:  That will be fine, Your Honor.

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

Sentencing Hearing
Thursday, October 10, 2013

And to the extent that the judgment is going to be entered, words to the effect of, that there will be a money judgment, the amount to be determined at a later date, should be inserted in that judgment.

**THE COURT:** All right. Why don't you submit a revised order for us to enter this afternoon.

**MS. AOUATE:** Thank you, Your Honor.

**THE COURT:** All right. Thank you.

Anything further, Counsel?

Mr. Gurewitz?

**MR. GUREWITZ:** No, Your Honor.

**THE COURT:** Mr. Chutkow?

(1:15 p.m.)

**MR. CHUTKOW:** Yes, Your Honor, just two minor points. I wanted to clarify that Mr. Kilpatrick's appeal period is 14 days, not 10 days.

**THE COURT:** Sorry.

**MR. CHUTKOW:** And also, I would like to ask the Court to find out if Mr. Kilpatrick or his attorneys have any objections to the sentence that have not previously been raised.

**THE COURT:** Right.

Mr. Gurewitz, Ms. Raben, any objections to the sentence as articulated that have not been previously raised on the record?

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

Sentencing Hearing
Thursday, October 10, 2013

**MR. GUREWITZ:**  I am not aware of any at the present time, Your Honor, so as of this moment, no.

**THE COURT:**  And none for the government?

**MR. CHUTKOW:**  No objections, Your Honor.

**THE COURT:**  All right.  Thank you, counsel.

(Brief pause.)

**THE COURT:**  I'm sorry, Mr. Gurewitz had asked that I recommend a placement in Texas, and I will recommend that.  All right.

**MR. GUREWITZ:**  Thank you, Your Honor.

**THE COURT:**  Thank you, Counsel.

**THE CLERK:**  All rise.  Court stands in recess.

(Proceedings concluded 1:16 p.m.)

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01

Sentencing Hearing
Thursday, October 10, 2013

- - -

**C E R T I F I C A T I O N**

I, Suzanne Jacques, Official Court Reporter for the United States District Court, Eastern District of Michigan, Southern Division, hereby certify that the foregoing is a correct transcript of the proceedings in the above-entitled cause on the date set forth.

Date: October 10, 2013

s:_____

  SUZANNE JACQUES
  Official Court Reporter
  Eastern District of Michigan

USA v. Kwame Kilpatrick   Case No. 10-CR-20403-01